[No. D059019. Fourth Dist., Div. One. Sept. 13, 2012.]

PAUL W. HAWRAN, Plaintiff and Appellant, v.
HARRY HIXSON, JR., et al., Defendants and Appellants.

**COUNSEL**

Law Offices of George Rikos and George D. Rikos for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton and Richard A. Paul for Defendants and Appellants.

**OPINION**

**O'ROURKE, J.**—Plaintiff and appellant Paul W. Hawran filed a lawsuit against defendants and appellants Sequenom, Inc. (Sequenom), and Sequenom directors Harry Hixson, Jr., Richard Lerner, and Ronald Lindsay, stemming from representations made in a widely disseminated press release concerning Sequenom's internal investigation into its handling of certain research and development test data and results, which issued on the same day that defendants filed a legally required disclosure of information to the United States Securities and Exchange Commission (SEC). The trial court granted in part defendants' special motion to strike Hawran's first amended complaint as a strategic lawsuit against public participation under Code of Civil Procedure section 425.16 (commonly known as the anti-SLAPP statute),[1] in which defendants unsuccessfully asserted, among other things, the press release was

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

absolutely privileged by the official proceeding and fair reporting privileges (Civ. Code, § 47, subds. (b), (d)). The court left standing Hawran's causes of action against all of the defendants for defamation, invasion of privacy, and unfair business practices under the unfair competition law (UCL; Bus. & Prof. Code, § 17200), as well as Hawran's breach of contract cause of action against Sequenom.

Defendants appeal from the partial denial of their motion, arguing Hawran did not demonstrate a probability of prevailing on the merits of his claims. In part, they maintain the statements made within the press release are not defamatory, and in any event are absolutely or qualifiedly privileged. Hawran cross-appeals, contending the trial court should have denied defendants' motion in its entirety because all of his causes of action are exempted from the anti-SLAPP law by the commercial speech exemption of section 425.17, subdivision (c).

■ We hold Hawran did not meet his burden to show his causes of action fall within the commercial speech exemption, and thus they are subject to the anti-SLAPP law. However, we further hold the absolute and qualified privileges of Civil Code section 47 do not apply to defendants' press release, and that Hawran otherwise demonstrated a probability of prevailing on his causes of action for defamation, invasion of privacy, unfair business practices and breach of contract. Accordingly, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Sequenom is a publicly traded diagnostic testing and genetics analysis company, whose common stock trades on the NASDAQ. Hawran was its chief financial officer from April 2007 to his resignation on September 25, 2009.

In the spring of 2009, Sequenom publicly admitted that previously reported research and development results for a certain diagnostic test for fetal Down syndrome (at times, Trisomy 21 or T21) were mishandled by employees on the Sequenom science team. Thereafter, Sequenom's stock price declined, derivative and securities fraud lawsuits were filed, and Sequenom commenced its own internal investigation, led by a special litigation committee (SLC). In April 2009, Sequenom issued a press release concerning the delay in the launch of the T21 test due to the mishandling, and a day later filed a "Form 8-K"[2] reporting to the SEC Sequenom's formation of the SLC and

---

[2] The SEC requires disclosure of specified material changes and other events "that the registrant deems of importance to security holders" whenever they occur via a Form 8-K. (Form 8-K, item 8.01 <http://www.sec.gov/about/forms/form8-k.pdf> [as of Sept. 13, 2012]; see 17 C.F.R §§ 240.13a-11, 249.308 (2012); *In re Boston Scientific Corp. Securities Litigation*

other information. In June 2009, Sequenom was alerted that the SEC had commenced an investigation into matters related to the T21 issue.

In September 2009, defendants made Hawran an offer that if he resigned as chief financial officer, he would not be associated with the mishandling and would be separated from others involved in the test data mishandling. In reliance on those representations, Hawran resigned on September 25, 2009.

On September 28, 2009, Sequenom filed another Form 8-K and issued a press release (hereafter the September press release or press release) announcing the completion of the SLC's independent investigation. In part, the September press release stated Sequenom had failed to put in place adequate protocols and control for the conduct of studies related to the program, but that the board of directors had begun to implement various remedial measures. The press release continued: "The company has terminated the employment of its president and chief executive officer, Harry Stylli, Ph.D., and its senior vice president of research and development, Elizabeth Dragon, Ph.D., effective immediately. In connection with the termination of Dr. Stylli's employment, the company's board of directors has requested that he resign as a director, which he is obligated to do under the terms of his employment agreement. The company has obtained the resignation of its chief financial officer, Paul Hawran, and one other officer. While each of these officers and employees has denied wrongdoing, the special committee's investigation has raised serious concerns, resulting in a loss of confidence by the independent members of the company's board of directors in the personnel involved."[3] (Italics omitted.)

In August 2010, Hawran sued Hixson, Lerner and Lindsay and several days later filed a first amended complaint adding Sequenom as a defendant. The first amended complaint sets forth causes of action for defamation, invasion of privacy/false light, negligent and intentional interference with

---

(1st Cir. 2012) 686 F.3d 21, 28, fn. 2.) For example, certain information is required to be disclosed on a Form 8-K if a company's principal executive officer, president, principal financial officer, principal accounting officer, or principal operating officer resigns or is terminated from that position. (Form 8-K, item 5.02.) The SEC's reporting requirement is designed to make accurate information available to the investing public, and the mandatory filings allow the SEC to determine whether to investigate a particular transaction. (*U.S. v. Berger* (9th Cir. 2007) 473 F.3d 1080, 1099.)

[3] The item 5.02 section of Sequenom's September 28, 2009 Form 8-K states on this point: "On September 25, 2009, Paul Hawran informed us that he is resigning as our chief financial officer effective immediately." In the item 8.01 section appearing later on the Form 8-K, Sequenom further reported: "In addition to the officer departures described in item 5.02 of this report, we have terminated the employment of three other employees and obtained the resignation of one other officer. While each of these officers and employees has denied wrongdoing, the committee's investigation has raised serious concerns, resulting in a loss of confidence by the independent members of our board of directors in the personnel involved."

prospective economic advantage, violation of the UCL, breach of contract, and negligent and intentional misrepresentation. Hawran alleged that in 2008 and 2009, he raised objections about a board member compensation program proposed by Hixson that in his perception constituted inappropriate self-dealing, and also raised issues concerning the competence and tax reporting of certain members of Sequenom's audit committee. Hawran alleged Hixson criticized him for his efforts to ensure proper tax reporting and to hold board members to their fiduciary obligations to shareholders. According to the complaint, Sequenom used the T21 test mishandling to constructively fire him for his prior complaints. Hawran alleged his personal and professional reputation was irreparably damaged, and his ability to earn a living impacted, by the September press release, which falsely stated he had denied any wrongdoing; blamed him for the data mishandling; and directly and implicitly called into question his ethics, management capabilities, and performance as Sequenom's CFO. He alleged the press release defamed him and painted him in a false light, and substantially interfered with his prospective employment opportunities; that despite his diligence, he had been unable to find alternative employment due to defendants' interference.

Defendants moved to strike Hawran's first amended complaint under section 425.16. They argued section 425.16 applied to each cause of action because the September press release was issued in connection with an SEC investigation and also addressed a matter of public concern, rendering it a protected writing made "in connection with an issue under consideration or review by . . . [an] official proceeding authorized by law" under section 425.16, subdivision (e)(2). They also argued the press release qualified for protection under section 425.16, subdivision (e)(3) and (4) as a "written . . . statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" or "other conduct in furtherance of the exercise of the constitutional right of petition or . . . free speech in connection with a public issue or an issue of public interest." Defendants maintained Hawran could not demonstrate a probability of prevailing on any of his causes of action because he could not prove the statements were made or, if made, directed at him; the statement that Hawran "denied wrongdoing" was not defamatory; and the statement that Sequenom lost confidence or had serious concerns constituted opinion and Hawran could not prove the statement was false. Defendants further argued the press release was absolutely privileged under Civil Code section 47, subdivision (b) as made in an official proceeding, and under Civil Code section 47, subdivision (d) as a fair and true communication to the press of an official public proceeding. Finally, defendants argued Hawran could not prove liability against any of the individual defendants because issuance of the press release was done by Sequenom after board approval, not by the individuals.

In support of the motion, defendants presented the declarations of two Sequenom executives and one of its attorneys of record. In part, the executives addressed the Form 8-K disclosures, the various lawsuits and government investigations commenced against Sequenom, and the press release distribution process.

In opposition, Hawran argued the September press release was excluded from protection under the commercial speech exemption of section 425.17, subdivision (c). He further argued the press release did not qualify as an act in furtherance of defendants' rights of free speech. In particular, he asserted it did not mention the SEC investigation and contained defamatory content not included in Sequenom's Form 8-K filing; its dissemination to the public was made via one-way communications that did not constitute statements made in a public forum; and the press release was an effort to further Sequenom's private commercial and economic aims of reassuring its customers and investors that it had corrected its problems. Hawran argued it was probable he would prevail on his claims for defamation, invasion ·of privacy, negligent and intentional interference with prospective economic advantage, unfair business practices, breach of contract, and misrepresentation. He maintained the press release was not privileged under Civil Code section 47, subdivision (b) or (d), and the SLC members were individually liable under the "group published information" doctrine.

Hawran presented his own declaration in opposition to the motion, as well as declarations from Attorney Craig Nicholas, Attorney Thomas Zaccaro, and Alan Mack, Sequenom's senior director of prenatal diagnostics and director of sales of clinical diagnostics from February 2008 through October 2010. In part, Mack described Sequenom's "custom and practice" during his tenure to use press releases to advertise its products to its customers; provide press releases to members of the sales department as part of their commercial and advertising materials; design such releases to inform customers as well as potential and existing investors; and disseminate them on Web sites with the "intended purpose" that they be picked up and influence customers and investors. He averred that Sequenom's "directive" was to use the press release's exact language as talking points to customers and investors. According to Mack, the September 28, 2009 press release was "designed to calm the fears of our customers and investors and assure them that the problem was fixed and our products were moving forward."

In reply, defendants submitted additional declarations and asserted various evidentiary objections to portions of Hawran's, Nicholas's and Mack's declarations. In addition to addressing section 425.16's application and Hawran's arguments as to the merits of his claims, they argued the exemption of section 425.17 was "facially inapplicable" to the individual defendants.

Defendants further argued the exemption did not apply to Sequenom's press release because the release did not make factual statements about Sequenom's operations and its purpose was to meet mandatory SEC and NASDAQ reporting obligations.

Hawran filed a surreply, including "supplemental" declarations from Nicholas and Mack. He moved to strike in its entirety the evidence submitted by defendants as filed in violation of his due process rights. Hawran alternatively asserted objections to portions of defendants' declarations as lacking personal knowledge and foundation.

Defendants then moved to strike all but the first paragraph of Hawran's surreply papers, arguing the court had limited Hawran's surreply to the burden of proof on the section 425.17 commercial exemption.

Following arguments on the matter and resolving the parties' motions to strike and evidentiary objections, the trial court granted in part defendants' section 425.16 motion. Specifically, with regard to the interference with prospective economic advantage and misrepresentation claims as to all defendants, and as to the breach of contract claim as to the three individual defendants, the court found defendants had shown Hawran's causes of action arose from a writing, namely Sequenom's September press release, made in connection with an issue under consideration or review by an official proceeding authorized by law. It further found the claims were based on Sequenom's postings about its corporate activity, which were communications about issues of public interest made in a public forum. The court rejected application of the commercial speech exemption of section 425.17. It denied the motion as to Hawran's defamation, invasion of privacy and UCL causes of action, finding Hawran had demonstrated a probability of prevailing on those claims, and defendants had not established the applicability of any Civil Code section 47 privileges.

Defendants and Hawran appeal.

## DISCUSSION

### I. *Defendants' Motion to Strike Portions of Hawran's Cross-appeal Reply Brief*

■ Defendants have moved to strike pages 13 through 52 of Hawran's cross-appellant's reply brief under California Rules of Court, rules 8.204(e)(2)(B) and 8.216(b)(3), the latter of which requires a party to confine its "reply brief, or the reply portion of a combined brief, to points raised in its appeal." They ask us to strike this portion of Hawran's reply brief as not

limited to the issues raised in Hawran's cross-appeal, namely, application of the commercial exemption of section 425.17.

California Rules of Court, rule 8.204(e) provides in part: "If a brief does not comply with this rule: [¶] . . . [¶] (2) If the brief is filed, the reviewing court may, on its own or a party's motion, with or without notice: [¶] (A) Order the brief returned for corrections and refiling within a specified time; [¶] (B) Strike the brief with leave to file a new brief within a specified time; or [¶] (C) Disregard the noncompliance."

■ We deny defendants' motion to strike in the interest of judicial economy, as the rule on which they rely does not authorize us to strike nonconforming briefs outright, but requires us to give Hawran "leave to file a new brief within a specified time." (Cal. Rules of Court, rule 8.204(e)(2)(B).) However, we give effect to defendants' motion by disregarding issues or contentions raised for the first time in Hawran's cross-appellant's reply brief. (See *Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1387–1388 [129 Cal.Rptr.3d 200] [appellate court will not consider arguments raised for the first time in a reply brief because it deprives the appellant of the opportunity to respond to the argument].) "The purpose of [California Rules of Court, rule 8.216(b)(3)] is to ensure that in its reply brief a party addresses only issues germane to its own appeal. For example, a cross-appellant may not use its *cross-appellant's* reply brief to answer points raised in the *appellant's* reply brief." (Advisory Com. com., 23 pt. 3 West's Ann. Codes, Rules (2012 supp.) foll. rule 8.216, p. 19.) Hawran's cross-appeal raises only the matter of the commercial speech exemption of section 425.17. We deem arguments beyond that issue new matters or new theories of error, and do not consider them.

## II. *Section 425.16 Burdens and Appellate Standard of Review*

■ "A special motion to strike is a procedural remedy to dispose of lawsuits brought to chill the valid exercise of a party's constitutional right of petition or free speech. [Citation.] The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. [Citation.] The Legislature has declared that the statute must be 'construed broadly' to that end." (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1165 [131 Cal.Rptr.3d 478]; see *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 279 [46 Cal.Rptr.3d 638, 139 P.3d 30] (*Soukup*).)

■ "The analysis of an anti-SLAPP motion . . . involves two steps. 'First, the court decides whether the defendant has made a threshold showing that

the challenged cause of action is one "arising from" protected activity.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819 [124 Cal.Rptr.3d 256, 250 P.3d 1115].) " 'In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.' " (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477 [87 Cal.Rptr.3d 275, 198 P.3d 66].) The court looks to " 'the gravamen or principal thrust' of the action." (*Id.* at pp. 477–478, quoting *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 193 [6 Cal.Rptr.3d 494].)

" 'If the court finds [the threshold] showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.] 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' " (*Oasis West Realty, LLC v. Goldman, supra*, 51 Cal.4th at pp. 819–820.)

If the defendant meets its threshold burden and the plaintiff asserts its claims are exempt under the commercial speech exemption of section 425.17, subdivision (c), the plaintiff then has the burden to show the applicability of that exemption. (See *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 22–26 [109 Cal.Rptr.3d 329, 230 P.3d 1117] (*Simpson*); *Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 717 [115 Cal.Rptr.3d 1].) If the plaintiff does not meet that burden, he or she must then establish a probability of prevailing on the claims. (See *Rivera*, at pp. 714–718.)

Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Oasis West Realty, LLC v. Goldman, supra*, 51 Cal.4th at p. 820.)

### III. There Is No Dispute Hawran's Claims Arise from Protected Activity

In part, the trial court found Sequenom's Form 8-K put the issues identified in the form under consideration or review by the SEC, and that Sequenom's September press release, from which Hawran's claims arose, was thus protected as a writing "made in connection with an issue under consideration or review by . . . any other official proceeding authorized by law . . . ." (§ 425.16, subd. (e)(2).)

This finding alone subjects Hawran's claims to section 425.16. Though defendants were not aggrieved by this aspect of the trial court's ruling in their favor (§ 902; *In re S.C.* (2006) 138 Cal.App.4th 396, 413–414 [41 Cal.Rptr.3d

453]; *Benitez v. North Coast Women's Care Medical Group, Inc.* (2003) 106 Cal.App.4th 978, 991 [131 Cal.Rptr.2d 364]), they nevertheless proceed to address all of the theories relied upon in their motion below to show they met section 425.16's threshold burden. As for Hawran, he states: "Should this Court conclude that the [September press release] is not commercial speech pursuant to Section 425.17, Mr. Hawran will not contest on appeal Judge Dato's conclusions regarding the *textual applicability* of subsections (e)(2) and (3) for making his claims at least subject to anti-SLAPP review. . . ."[4] Because we reject application of section 425.17's commercial exception below (pt. IV., *post*), Hawran's statement is a concession of the point.

Given the trial court's unchallenged finding that Hawran's claims fall within section 425.16, subdivision (e)(2), we need not reach the correctness of that finding, or defendants' various other arguments and theories. Comment on those matters by this court would be advisory in any event. (*In re S.C., supra*, 138 Cal.App.4th at p. 414.)

## IV. *Commercial Speech Exemption of Section 425.17, Subdivision (c)*

### A. *Legal Principles*

■ Section 425.17, subdivision (c) exempts a cause of action arising from commercial speech from the anti-SLAPP law when "(1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17[, subdivision] (c)(2) [(i.e., an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer)]." (*Simpson, supra*, 49 Cal.4th at p. 30.)

---

[4] Hawran, however, seeks to preserve his disagreement with the trial court's reasoning: "However, Respondent respectfully disagrees with portions of Judge Dato's reasoning for finding those subsections applicable to the extent he appeared to accept Appellants' contentions about the similarity of the 8K and the [press release's] content as it related to Appellants' defamatory statements . . . ."

The so-called "commercial speech exemption . . . 'is a statutory exception to section 425.16' and 'should be narrowly construed.' " (*Simpson, supra,* 49 Cal.4th at p. 22.) It is Hawran's burden to establish its application. (*Id.* at p. 24.)

B. *Hawran Has Not Shown the Allegedly Defamatory Portions of the September Press Release Are Representations of Fact About Sequenom's Business Operations, Goods or Services*

Hawran contends all of his causes of action fall within the commercial speech exemption of section 425.17, subdivision (c) because he has presented evidence establishing each of the above elements in connection with his claims based on Sequenom's September press release. In part, he argues his claims arise from the September press release concerning Sequenom's business operations; that the press release "[is] almost exclusively devoted to explaining what went wrong in its operations concerning the development and testing of a new genetic product and the operational steps [defendants] were taking to address the problem, and to announce a conference call to discuss these matters with investors, customers and other interested parties." Hawran points to Mack's declaration, in which Mack broadly characterized the intent and purpose of the September press release (and Sequenom's press releases generally) and explained Sequenom's custom and practice as to its distribution. Hawran maintains defendants' issuance of the press release is analogous to the circumstances in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939 [119 Cal.Rptr.2d 296, 45 P.3d 243]; that like the press releases, letters and other documents that Nike issued in defense of its working conditions in *Kasky* (*id.* at pp. 947–948), the September press release was intended for the consumer and "designed to maintain and increase Sequenom's sales and profits."

Defendants argue the exemption does not apply to the September press release because it was for the purpose of meeting mandatory NASDAQ reporting requirements and the allegedly defamatory comments within it did not concern Sequenom's business or promote its products; did not make factual representations about Sequenom's operations; were not made to secure sales or in the course of selling goods or services; and were not made to customers within the meaning of the statute.[5]

---

[5] Defendants also unpersuasively respond, as they did below, that the commercial exemption does not apply to anti-SLAPP motions made by individual defendants; they maintain the legislative history and case law demonstrate the Legislature's goal in enacting the exemption was to limit "corporate abuse" of the anti-SLAPP law. This proposition, which is a pure question of law (*Major v. Silna* (2005) 134 Cal.App.4th 1485, 1493, fn. 4 [36 Cal.Rptr.3d 875]), is unsupported by the legislative history. The Legislature's statement in enacting section 425.17 suggests no such limitation. Its findings state only that " 'there has been a disturbing

Hawran's arguments as to the broad purposes of the September press release are unavailing. They do not address the relevant issue, that is, whether the *allegedly defamatory portions* of the September press release are " 'representations of fact about [Sequenom's] . . . business operations, goods, or services.' " (*Simpson, supra,* 49 Cal.4th at pp. 30–31.) In *Simpson,* the California Supreme Court held the commercial speech exemption did not apply to a plaintiff's complaint for defamation, trade libel, false advertising and UCL violations against an attorney who put out an advertisement containing allegedly defamatory statements about the plaintiff's galvanized screw products. (9 Cal.4th at pp. 17–20, 30.) The court held any implication in the advertisement that the screws were defective " 'is not "about" [the attorney's] or a competitor's "business operations, goods, or services . . . ." (§ 425.17[, subd.] (c)(1).) It is, rather, a statement "about" [the plaintiff]—or, more precisely, [the plaintiff's] products.' It therefore falls squarely outside section 425.17(c)'s exemption for commercial speech." (*Id.* at p. 30.) The court rejected the plaintiff's argument that the exemption should apply as long as the statement giving rise to the cause of action was *accompanied* by factual representations about the defendant's business operations, goods or services. (*Id.* at p. 32.) It held to the extent the advertisement included statements about the attorney's own services, including an offer to investigate potential claims, and an asserted implication that he had discovered the alleged defect, these statements did not trigger the commercial speech exemption in part because the plaintiff's defamation claims did not arise from those statements; instead, the claims arose from the attorney's statements about the alleged defects in the plaintiff's galvanized screws. (*Id.* at pp. 30–32.)

Here, Hawran's causes of action specifically reference and are based on the assertedly false and defamatory statements in the September press release concerning his resignation and purported denial of wrongdoing. They do not "arise from" the press release's other statements concerning the deficiencies of Sequenom's test protocols and controls, or the remedial measures Sequenom's board intended to put into place as a result. As *Simpson* explains (*Simpson, supra,* 49 Cal.4th at p. 32), section 425.17's commercial speech exemption is

---

abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process or Section 425.16.' " (*Simpson, supra,* 49 Cal.4th at p. 27.) The case on which defendants' rely, *Major,* 134 Cal.App.4th 1485, which addressed the legislative limitations on the public interest exemption of section 425.17, explained that the Legislature observed that corporations were the *"principal source* of the 'disturbing abuse' of the anti-SLAPP law" (*Major,* at p. 1496, italics added), but the *Major* court did not restrict application of the exemptions of section 425.17 to anti-SLAPP motions of corporate defendants.

not triggered by the presence of other representations of fact concerning Sequenom's business operations or services contained in the press release, if Hawran does not seek to impose liability based on those statements. Though the targeted statements that Sequenom "obtained the resignation of" Hawran and that he "has denied wrongdoing" arguably may broadly concern or relate to Sequenom's corporate events or business decisions, narrowly construing the exemption as we must (*Simpson*, at p. 22), we cannot say those statements are "about" Sequenom's business operations, goods, or services. (Accord, *Simpson*, at p. 30.) This conclusion likewise applies to the September press release's statement that "the SLC's investigation has raised serious concerns, resulting in a loss of confidence by the independent members of the company's board of directors in the personnel involved." That statement is "about" the SLC's investigation and Sequenom's board's reaction to it.

Hawran's reliance on *Kasky v. Nike, Inc., supra*, 27 Cal.4th 939 is likewise misplaced. *Kasky* does not involve a special motion to strike under section 425.16, or the commercial speech exemption of section 425.17. Thus, it is not helpful in determining whether Hawran's causes of action arise from commercial speech as defined by the statute. (Accord, *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 948 [59 Cal.Rptr.3d 48].)

■ The plain language of section 425.17 requires that a plaintiff establish all of the elements of the section 425.17 exemption. (§ 425.17, subd. (c)(1), (2) [exemption applies if "both of the following conditions exist . . ."]; see *Simpson, supra*, 49 Cal.4th at p. 30 [expressing the four elements in the conjunctive].) Thus, our conclusion that Hawran's causes of action do not arise from representations of fact about Sequenom's business operations, goods, or services ends the inquiry. Because Hawran has not demonstrated applicability of the section 425.17, subdivision (c) exemption, we proceed to the probability of prevailing prong of section 425.16.

> V. *Hawran Has Demonstrated a Probability of Prevailing*
> *on the Merits on His Defamation, Invasion of Privacy,*
> *UCL and Breach of Contract Claims*

■ "To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the

defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citation.] In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup, supra*, 39 Cal.4th 260, 291; see *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 738 [3 Cal.Rptr.3d 636, 74 P.3d 737] ["the anti-SLAPP statute requires only 'a minimum level of legal sufficiency and triability' . . ."].)

Defendants contend the trial court erred in ruling Hawran demonstrated he was likely to prevail on his causes of action for defamation, invasion of privacy, unfair competition and breach of contract. We address seriatim defendants' contentions, including their assertion of the Civil Code section 47 privileges.

### A. Liability of the Individual Defendants for the September Press Release's Statements ·

Defendants preliminarily contend Hawran cannot establish that any of the individual defendants is liable for statements made in Sequenom's press release. In particular, they maintain the "group published information doctrine" (also known as the "group pleading doctrine" [see *Bains v. Moores* (2009) 172 Cal.App.4th 445, 450, fn. 4, 470, fn. 38 [91 Cal.Rptr.3d 309]]) on which Hawran successfully relied below to maintain his claims for defamation, invasion of privacy, and unfair competition against the individual defendants, is inapplicable to an evidentiary motion such as a special motion to strike because it is a pleading device solely for the purpose of determining the sufficiency of Hawran's pleadings. (See *id.* at pp. 475–476.) They assert the sole evidence in the record was that Sequenom filed the September 28, 2009 Form 8-K and that its board of directors, not the individual defendants, formulated the press release based on the Form 8-K's contents. Thus, defendants argue, the press release was a "corporate act" ratified by the board, for which the individuals are not liable.

■■■ "[T]he group published information doctrine is a pleading doctrine that, where applicable, allows a party to attribute statements made in a company's public documents, such as annual reports and press releases, to individual members of the company's board of directors." (*Bains v. Moores, supra*, 172 Cal.App.4th at p. 450, fn. 4, citing *Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 208 & fn. 8 [114 Cal.Rptr.2d 127].) " ' "The rationale for group pleading is that facts about fraud flowing from the internal operation of a corporation are peculiarly, and often exclusively, within the control of the corporate insiders who manage the parts of the corporation involved in the

fraud." ' " (*Kamen*, at p. 208, fn. 8.) In *Kamen*, the court observed that the Ninth Circuit, which developed the doctrine, had explained that " ' "[i]n cases of corporate fraud where false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." ' " (*Ibid.*)

In *Bains v. Moores*, this court observed there were no reported California cases applying the group pleading doctrine in the context of a summary judgment motion. (*Bains v. Moores, supra*, 172 Cal.App.4th at pp. 475–476.) After reviewing federal authorities and some commentary on the issue, we held the doctrine did not apply after the pleading stage. (*Id.* at p. 476.) In part, we observed that its rationale is less compelling in the context of a summary judgment, in which discovery is complete. (*Id.* at p. 475.) We also questioned the continued viability of the presumption after enactment of the Private Securities Litigation Reform Act of 1995 (Pub.L. No. 104-67 (Dec. 22, 1995) 109 Stat. 737), which heightened pleading standards for securities class action lawsuits. (172 Cal.App.4th at p. 474.)

■ For the same reasons set forth in *Bains v. Moores, supra*, 172 Cal.App.4th 445, we conclude the group pleading doctrine does not extend to the anti-SLAPP context. Though in opposing defendants' section 425.16 motion Hawran must show his complaint is "legally sufficient," section 425.16 also requires he present admissible evidence to support a prima facie showing of facts sufficient to sustain a favorable judgment on the merits. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713–714 [54 Cal.Rptr.3d 775, 151 P.3d 1185].) We decline to " 'transmut[e] [the pleading concept] into a rule of substantive law' " or " 'convert[] [it] into a rebuttable evidentiary presumption . . . .' " (*Bains v. Moores*, at p. 475.) Thus, the only question for purposes of our review is whether, accepting Hawran's evidence as true and only looking to defendants' evidence to assess whether it defeats Hawran's as a matter of law, Hawran established his causes of action against the individual defendants have minimal merit. (*Soukup, supra*, 39 Cal.4th at pp. 269, fn. 3, 291.)

■ Hawran's causes of action for defamation, invasion of privacy, and unfair competition against the individual defendants are based on the assert- edly defamatory statements in the press release.[6] To support a claim for defamation, Hawran need only establish that the individual defendants took a

---

[6] In his defamation cause of action, Hawran alleges: "On September 28, 2009, Defendants induced [Sequenom], in a writing of wide public circulation, published [*sic*] various false statements about Mr. Hawran and his employment at Sequenom. The written publication, a press release, specifically referenced Mr. Hawran." He alleged the statements "falsely stated or implied" that "Hawran was of questionable moral or ethical character"; he was a "failure as a manager or supervisor and failed to place adequate protocols and controls at Sequenom"; that his "actions justifiably caused 'serious concerns' by Sequenom and justified a loss of

"responsible part" in the publication of defamatory matter. (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1245 [7 Cal.Rptr.3d 576, 80 P.3d 676]; see *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 712 [61 Cal.Rptr.3d 29] (*Overstock.com, Inc.*); *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 549 [46 Cal.Rptr.2d 880] ["The general rule for defamation is that only one 'who takes a *responsible* part in the publication is liable for the defamation.' "], quoting *Osmond v. EWAP, Inc.* (1984) 153 Cal.App.3d 842, 852 [200 Cal.Rptr. 674]; *Jones v. Calder* (1982) 138 Cal.App.3d 128, 134 [187 Cal.Rptr. 825].) The court in *Overstock.com, Inc.* explained: "Thus, participating in publication of an article as editor can subject a person to liability. [Citation.] However, liability will not attach to a business manager of a newspaper published in a foreign language he or she did not understand, where there was no evidence the manager exerted control over editorial staff and it was undisputed he or she had no advance knowledge of the preparation or contents of the defamatory articles. [Citation.] Nor is financial contribution to a political campaign a sufficient hook for liability where the contributor is not involved in the preparation, review or publication of the allegedly defamatory campaign literature." (*Overstock.com, Inc.*, at p. 712, citing *Jones*, at p. 134, *Sakuma v. Zellerbach Paper Co.* (1938) 25 Cal.App.2d 309, 321–322 [77 P.2d 313] and *Matson*, at p. 549.) We reject defendants' argument that in the absence of the group pleading doctrine, Hawran is required to "introduce actual evidence that the release was drafted by the individuals."

Here, Hawran in his supporting declaration averred that the individuals, Hixson, Lerner and Lindsay, were members of the SLC and that the SLC was responsible for the investigation of the purported scientific mishandling of the subject test data, met at least weekly to discuss the internal investigation, and engaged outside counsel to conduct the investigation. Though Hawran's declaration includes the statement that "the SLC and [Sequenom] chose to issue the defamatory and false press release," the trial court sustained defendants' objection to that portion of the declaration on foundation grounds, and Hawran does not challenge that ruling on appeal. Hawran's evidence otherwise does not address whether Hixson, Lerner or Lindsay took some "responsible part" in the publication of the press release.

'confidence' " in him; that "Sequenom accused [him] of 'wrongdoing[]' "; that he "engaged in 'wrongdoing' " and his "efforts to clear his name of any wrongdoing were unavailing and were suspect"; that he "is to blame for failures related to the test—failures that led to the filing of numerous state and federal civil complaints, and failures which led to investigations by law enforcement" and that he "is unfit to work in the San Diego professional community or the biotechnology/genomic community." These allegations are repeated in Hawran's false light invasion of privacy cause of action. Hawran alleges in support of his unfair competition cause of action that defendants engaged in an unlawful business act or practice "because Defendants' defamatory act of inducing, preparing and publishing the press release and interfering with Mr. Hawran's efforts to find new employment violate California law."

However, defendants presented the supplemental declaration of Ian Clements, Sequenom's senior director of investor relations and corporate communications, who averred he "oversaw the release of the Press Release of September 28, 2009," and that the release was "formulated" by Sequenom's board of directors to mirror the contents of Sequenom's Form 8-K filing. He stated the release was "provided to me by the Board and its securities counsel." Hixson, via his declaration, confirmed that in addition to being appointed to the SLC, Hixson, Lerner and Lindsay were all Sequenom directors (Hixson being the chairman of the board) in September 2009.

We conclude that evidence that each individual defendant was a member of both the SLC and Sequenom's board, which created the press release and provided it to Clements, combined with the fact that the topic of the September 28, 2009 press release included the SLC's findings, satisfies Hawran's minimal burden on the issue of whether the individual defendants took a responsible part in its publication. (*Overstock.com, Inc., supra*, 151 Cal.App.4th at pp. 699–700 [plaintiff's burden of establishing a probability of prevailing is "not high" because § 425.16 permits early intervention in lawsuits alleging unmeritorious causes of action that implicate free speech concerns, and limits opportunity to conduct discovery].)

Of course, this conclusion does not by itself permit Hawran's claims to proceed; he must still demonstrate a probability of prevailing on the merits of his defamation, invasion of privacy and UCL-related claims against the individuals and Sequenom.

B. *Defamation/False Light Invasion of Privacy/UCL Claims*

 Defamation requires a publication that is false, defamatory, unprivileged, and has a tendency to injure or cause special damage. (*Taus v. Loftus, supra*, 40 Cal.4th at p. 720; Civ. Code, §§ 44, 45.) To establish a false light invasion of privacy claim, Hawran must meet the same requirements. (*Kapellas v. Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 149 [122 Cal.Rptr.3d 264].) Hawran's UCL claim is derivative of Hawran's defamation cause of action, that is, it is based on the same assertedly false and defamatory press release statements, and likewise that cause of action stands or falls with that underlying claim. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937] [UCL " 'borrows' violations from other laws by making them independently actionable as unfair competitive practices"].) We refer to these three causes of action collectively as the defamation-related claims.

1. *Absolute Privileges of Civil Code Section 47, Subdivisions (b) and (d)*

Defendants contend Hawran cannot establish a probability of prevailing on his defamation-related claims because the September press release is absolutely privileged as either a fair and true report of an official proceeding to a public journal (Civ. Code, § 47, subd. (d)) or a statement made pursuant to an official proceeding (Civ. Code, § 47, subd. (b)). As we will explain, we disagree.

 a. *The September Press Release Is Not Subject to the Fair Reporting Privilege for a Publication Made to a Public Journal of a Public Official Proceeding or Statements Made in the Course Thereof*

 Civil Code section 47 makes privileged "a fair and true report in, or a communication to, a public journal, of . . . [a] public official proceeding, . . . or . . . of anything said in the course thereof . . . ." (Civ. Code, § 47, subd. (d);[7] see *Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337 [93 Cal.Rptr.3d 782].) "The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings." (*Balzaga*, at p. 1337; see *Kilgore v. Younger* (1982) 30 Cal.3d 770, 777 [180 Cal.Rptr. 657, 640 P.2d 793].) If Civil Code section 47, subdivision (d) applies, the statement is absolutely privileged regardless of the defendants' motive for reporting it. (See *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 974 [234 Cal.Rptr. 702].) "In assessing this question, the 'publication[] [is] to be measured by the natural and probable effect [it] would have on the mind of the average reader. [Citations.] The standard of interpretation to be used in testing alleged defamatory language is how those in the community where the matter[] [was] published would reasonably understand [it].' " (*Kilgore v. Younger*, at p. 777.)

 Defendants bear the burden of proving the privilege's applicability. (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 348–349 [37 Cal.Rptr.3d 480].) Because there is no meaningful factual dispute over the content and distribution of the September press release,[8] whether the privilege applies is a

---

[7] Civil Code section 47, subdivision (d) states that a privileged communication is one that is made: "(1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued."

[8] Clements stated in his supporting declaration that *Sequenom's* press releases were uploaded to a wire service distribution vehicle, PR Newswire. He averred: "The news is

question of law. (See *Howard v. Oakland Tribune* (1988) 199 Cal.App.3d 1124, 1128 [245 Cal.Rptr. 449].)

Broadly positing that communications and investigations with the SEC are considered "official proceedings," and relying on *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 [54 Cal.Rptr.2d 830] (*Dove Audio*), defendants argue the trial court's conclusion that the "press release is an official proceeding" renders the press release subject to this privilege. They assert the September press release was "virtually identical" to Sequenom's Form 8-K, and was drafted to "summarize Sequenom's internal investigation, [and the] ongoing SEC investigation, and to fulfill Sequenom's obligation to disclose changes to the public." Defendants argue the circumstances are directly analogous to those in *Microsoft Corp. v. Yokohama Telecom Corp.* (C.D.Cal. 1998) 993 F.Supp. 782.

We are not persuaded. In addressing the first prong of section 425.16, the trial court did not conclude the September press release was an official proceeding. Rather, it ruled the press release was made "in connection with an issue under consideration or review by an official proceeding . . . ." This ruling does not, as defendants suggest, necessarily put the statements within the protection of the Civil Code section 47, subdivision (d) privilege pursuant to *Dove Audio*. Indeed, *Dove Audio* does not address the fair reporting privilege. It involved a letter made in preparation for sending a complaint to the Attorney General (*Dove Audio, supra*, 47 Cal.App.4th at p. 783), and the Court of Appeal held the letter was a communication preliminary to a proposed judicial proceeding (the complaint to the Attorney General), bringing it within the *litigation privilege* of Civil Code section 47, subdivision (b). (*Dove Audio*, at pp. 781–782, 783.) The court reasoned: "Just as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], we hold that such statements are equally entitled to the benefits of section 425.16." (*Dove Audio*, at p. 784.) *Dove Audio* simply does not support the proposition that a writing made in connection with issues under review by an official proceeding and thereby

distributed to major media such as Associated Press, Dow Jones, and similar major news and financial media chains or networks. The release is also distributed to other single media of consequence, like the editors at NewYorkTimes.com and similar major single media. Additionally, it is widely distributed to broader media like Google, Bloomberg, and the like." Hawran's evidence did not rebut Clements's assertions concerning the press release's distribution to media. Hawran agreed in his opposing declaration it was Sequenom's custom and practice to issue a press release "via newswire with the intent to have the press release picked up and widely distributed by various other media outlets to ultimately influence and inform customers and investors" and that the September press release was designed for those media outlets to pick up and repeat. Mack made similar statements.

protected by section 425.16, subdivision (e)(2) is equally entitled to protection as a fair report *of* that official proceeding.

Assuming for purposes of argument that dissemination of the September press release to PR Newswire and other news outlets was to a "public journal," the relevant inquiry is whether the September press release constitutes a report or communication "of" or about the SEC investigation or "of anything said in the course of" the SEC investigation. We conclude it is not such a report or communication.

The September press release is entitled "Sequenom Announces Completion of Independent Investigation." It begins by stating that Sequenom has completed the SLC's independent investigation related to the test data and results for the company's testing. It summarizes the independent directors' conclusions and lists the remedial measures implemented by the board. The press release then announces the termination or resignation of various officers and states that the members of the special committee and independent counsel "will make a presentation on the investigation to the staff of the [SEC]." The press release identifies the new interim officers appointed by Sequenom's board of directors, states Sequenom will no longer rely on certain test data and results, and explains Sequenom cannot provide guidance on completion of research and development but maintains confidence in the underlying science. It gives information concerning a conference call and Webcast on the subject.

Sequenom's evidence included the declaration of its vice-president and general counsel Clarke Neumann, who stated Sequenom was alerted in June 2009 that the SEC "had commenced an investigation of matters pertaining to the T21 issues" and that the Department of Justice "was commencing an inquiry." Neumann referenced an attached exhibit, a Form 8-K filed in October 2009, after dissemination of the press release. Similarly, Clements averred that "investigations were conducted by the [SEC] and other law enforcement agencies." Neither Neumann nor Clements described in any depth the issues underlying the SEC's investigation of T21 matters or explained how the September 28, 2009 press release reported on either that investigation or statements made during the course of it. Instead, Clements stated that Sequenom's board formulated the September press release so that investors and the public would be aware of Sequenom's internal SLC investigation findings and conclusions.

Indeed, the September press release does not mention the subject SEC investigation, much less "capture[] [its] substance, . . . 'gist' or 'sting' . . . ." (*Kilgore v. Younger, supra,* 30 Cal.3d 770, 777.) Having reviewed the entirety of the two-page press release, and particularly the assertedly defamatory

assertions concerning Hawran's resignation and denial of wrongdoing, we cannot say the press release purports to report on, summarize or describe the SEC proceeding or investigation, the history of the SEC proceeding or investigation, or any communications made "in the course of" that investigation. Rather, it is plain from the face of the document that the September press release is reporting the results and consequences of Sequenom's own internal investigation. Though the press release explains that a presentation to the SEC would be forthcoming, it does not purport to characterize or describe the contents of that presentation. Nothing in the September press release gives us the "gist" of the SEC's charges, if any, or the proceedings before it.

Concededly, the September press release communicates information similar to that contained in Sequenom's Form 8-K, which was filed for the purpose of complying with the SEC's mandatory disclosure requirements. While a Form 8-K may constitute a writing before an official proceeding (see, e.g., *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 731–732 [28 Cal.Rptr.3d 833] (*Fontani*) [involving a form U-5 filed with the National Association of Securities Dealers (NASD)], disapproved on other grounds in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, fn. 5 [46 Cal.Rptr.3d 41, 138 P.3d 193]), the Form 8-K is not *itself* an official proceeding. (*Romaneck v. Deutsche Asset Management* (N.D.Cal., Sept. 6, 2005, No. C05-2473 TEH) 2005 WL 2171987, *7 [emphasizing that the NASD form U-5 is privileged only because it is potentially made in preparation for an official proceeding by the NASD, but the form itself does not constitute the official proceeding].) The fact information in the press release was also disclosed to the SEC in a legally required Form 8-K does not transform the press release into a report *about* the SEC proceeding or about statements made in the course of that proceeding.

We perceive no comparison between these circumstances and cases in which the reporter's privilege was held to apply. In *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551 [1 Cal.Rptr.3d 245], the appellate court held the privilege applied to a newspaper's published articles and Internet postings on its own Web site that "fairly described the nature of" a stock manipulation scheme detailed in an SEC complaint. (*Id.* at pp. 1554–1555, 1559.) In *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036 [61 Cal.Rptr.2d 58], at issue in a defendant's anti-SLAPP motion was the publication of five news reports that described a state auditor's investigative audit of alleged mismanagement at a university training center and events leading up to that investigation. (*Id.* at pp. 1040, 1042, 1051.) Specifically, the articles detailed "the fact that the State Auditor was conducting an investigation of [the center]; the conduct of that investigation and statements made by various persons affected by or concerned with the subject of the audit; the substance of the background reports and charges leading up to the investigation; and a summary of the findings that ultimately

issued." (*Id.* at p. 1051.) The *Braun* court explained that reports comprising a "*history* of the proceeding" come within the fair reporting privilege even if the ultimate investigation was confidential. (*Id.* at p. 1050.) In *Jennings v. Telegram-Tribune Co.* (1985) 164 Cal.App.3d 119 [210 Cal.Rptr. 485], the court applied the fair reporting privilege to a newspaper report that a plaintiff was " 'convicted of tax fraud' " because it accurately conveyed the gist of judicial proceedings in which the plaintiff had pleaded no contest. (*Id.* at pp. 122, 127.) In *Microsoft Corp. v. Yokohama Telecom Corp., supra*, 993 F.Supp. 782, relied upon by defendants, the federal district court held the fair reporting privilege applied to a newspaper article paid for by Microsoft stating that Microsoft's competitor allegedly distributed counterfeit products to undercover investigators, which "capture[d] the substance of, and [did] not deviate from" a judicial proceeding, namely, the allegations in Microsoft's complaint. (*Id.* at p. 784.)

For the foregoing reasons, we conclude defendants have not met their burden of establishing application of the Civil Code section 47, subdivision (d) fair reporting privilege.

b. *Official Proceeding Privilege of Civil Code Section 47, Subdivision (b)*

 Nor can we conclude the September press release qualifies for protection under the Civil Code section 47, subdivision (b) official proceeding privilege, which confers an absolute privilege to communications made as part of a " 'judicial or quasi-judicial proceeding[],' " defined to include any sort of " 'truth-seeking' " or other official proceeding. (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957–958 [70 Cal.Rptr.3d 501].)

" 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 [63 Cal.Rptr.3d 398, 163 P.3d 89].) The privilege " 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' " (*Ibid.*) Thus, the official proceeding privilege extends to communications intended to report wrongdoing or trigger an investigation. (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 362, 363, 368 [7 Cal.Rptr.3d 803, 81 P.3d 244] (*Hagberg*).) However, the communication must be " 'in furtherance of the objects' " of the proceeding, which is " 'part of the requirement that the communication be connected with, or have some logical relation to, the [proceeding], i.e., that it not be

extraneous to the [proceeding].' " (*Action Apartment Assn., Inc. v. City of Santa Monica,* at p. 1251.) The privilege is nevertheless broadly applied and doubts are resolved in its favor. (*Wang v. Heck* (2012) 203 Cal.App.4th 677, 684 [137 Cal.Rptr.3d 332].)

It is questionable whether a press release so widely disseminated to the public at large, as was Sequenom's September press release, can meet the requirements of the official proceeding privilege. In addressing the litigation privilege of Civil Code section 47, subdivision (b), the court in *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134 [57 Cal.Rptr.2d 284], declined to apply the privilege to press conferences or press releases, explaining that the " 'connection or logical relation' which a communication must bear to litigation in order for the privilege to apply, is a *functional* connection," i.e., the communication must "function as a necessary or useful step in the litigation process and must serve its purposes" (*id.* at p. 1146) and "cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation," including vindication in the court of public opinion (*id.* at p. 1147). The test "can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case." (*Id.* at p. 1148.) Defendants' evidence, as we describe it more fully below, does not demonstrate that the September press release furthered some purpose of the SEC investigation relating to Sequenom's T21 issues, as opposed to supplementing Sequenom's required disclosures to the public.

We need not further address that issue, because we conclude for other reasons that the official proceeding privilege does not apply. In *Hagberg,* the California Supreme Court undertook an extensive overview of the official proceeding privilege and cases applying it, explaining it applied to letters urging the Attorney General to institute an investigation into an entity's tax-exempt status (*Hagberg, supra,* 32 Cal.4th at p. 362), a report to the DMV regarding another person's fitness to drive (*ibid.*), complaints to governmental agencies accusing others of fraud or wrongdoing (*id.* at p. 363), letters sent to a district attorney's office to prompt criminal prosecution or to a school board to prompt official action regarding a teacher's performance (*id.* at pp. 363–364), and complaints or reports to police (*id.* at pp. 364–366). The court pointed out it had previously held the official proceeding privilege did not apply to a communication between private parties (an insurer and dental patients) concerning the processing of insurance claims, even though the communication informed one of the parties that the insurer intended to report the dentist to a state dental professional association for possible discipline. (*Id.* at p. 365, citing *Slaughter v. Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886].) The communications between private parties concerning the processing of claims by a private entity "were not directed at preparing for or eliciting governmental action." (*Hagberg,* at p. 365.) The

court distinguished those circumstances, emphasizing the privilege " 'has been interpreted broadly to protect communication to or from *governmental* officials which may precede the initiation of formal proceedings.' " (*Ibid.*)

(**17**) *Hagberg* emphasized that "the critical question [in applying the official proceeding privilege] is the *aim* of the communication, not the forum in which it takes place. If the communication is made 'in anticipation of or [is] designed to prompt official proceedings, the communication is protected.' " (*Hagberg, supra*, 32 Cal.4th at p. 368.)

Here, defendants assert that the privilege applies, reasoning that the "Form 8-K filing constitutes an official proceeding," and the purpose of the September press release was to ensure accurate information published in the official SEC proceeding was available to the public. They argue the public at large—which they also describe as the "investing public"—was an "interested party" for purposes of applying the privilege. According to defendants, the press release serves the purpose of NASDAQ and SEC requirements by notifying the general public of changes to the internal governance of the company, and "[b]ecause Sequenom is a publicly traded company, any information that could drastically affect its stock price is a matter of public concern. . . ."

Defendants' evidence on this matter includes Clements's declaration, in which he averred that "SEC filings are public filings, and are made to the SEC as part of its regulatory process and requirements, but are not automatically redistributed by the SEC to the broader investment community. To ensure that news filed with the SEC can fairly reach the broad spectrum of institutional and individual investors, in addition to notifying the investor community and public, [Sequenom] from time to time issues press releases as a further way to disseminate news or developments of importance." He also stated, "Keeping investors and the public apprised of material Company developments is required by regulation and good practice. Because of the large number and wide distribution of shareholders, the Company issues press releases when disclosure or discussion of material information is appropriate." Defendants lodged copies of a Form 8-K with its accompanying instructions, as well as NASDAQ listing rule 5250[9] and a "frequently asked questions" page from the NASDAQ Web site.

---

[9] NASDAQ listing rule 5250(b), entitled "Obligation to Make Public Disclosure," provides in part: "Except in unusual circumstances, a Nasdaq-listed Company shall make prompt disclosure to the public through any Regulation FD compliant method (or combination of methods) of disclosure of any material information that would reasonably be expected to affect the value of its securities or influence investors' decisions." (NASDAQ listing rules, rule 5250(b)(1).) Regulation FD (Fair Disclosure) (17 C.F.R. § 243.100 et seq. (2012)) generally "prohibits a company and its senior officials from privately disclosing any material nonpublic

We have already stated that Sequenom's Form 8-K filing is not itself an official proceeding. (See pt. V.B.1.a., *ante*.) The authorities on which defendants rely, including *Fontani, supra*, 129 Cal.App.4th 719, do not convince us otherwise.[10] *Fontani* involved a defendant's anti-SLAPP motion seeking to strike defamation and other claims by the defendant's former employee, a broker-dealer. The appellate court addressed, among other things, whether statements made in a form U-5 (also known as the Uniform Termination Notice for Securities Industry Registration), were communications protected by the litigation privilege of Civil Code section 47, subdivision (b). (*Fontani*, at p. 733.) The form U-5 contains allegations of improper conduct by a broker-dealer, and the form in *Fontani*, submitted to the NASD, noted in part that the defendant had "terminated Fontani for 'violation of company policies by misrepresenting information in the sale of annuities . . . [and] not being properly registered . . . .'" (*Id.* at pp. 726, 731–732.) There was no evidence the filing resulted in an NASD investigation, but a New York Stock Exchange investigation did result. (*Id.* at p. 726.) The appellate court reasoned the form U-5 is made in anticipation of the bringing of an action or other official proceeding because a NASD investigation is at least one "potential consequence" of the filing. (*Id.* at pp. 731–732.) It also held the official proceeding privilege protected the statements within the form U-5 filed with the NASD because it "can be a precursor to an investigation." (*Id.* at pp. 734–735.)

We decline to extend *Fontani* to the circumstances of this case. Sequenom's Form 8-K filing may have some relation to the SEC proceeding merely because it broadly pertains to the same subject matter, namely the problems with Sequenom's T21 program. But unlike the form U-5, which is a report of wrongdoing to the NASD and may be a precursor to an investigation, the

information regarding the company or its securities to certain persons such as analysts and institutional investors." (*SEC v Seibel Systems, Inc.* (S.D.N.Y. 2005) 384 F.Supp.2d 694, 696.) Regulation FD states an issuer "shall make the 'public disclosure' of information . . . by furnishing to or filing with the Commission a Form 8-K . . . disclosing that information." (17 C.F.R. § 243.101(e)(1) (2012), citation omitted.) It further provides an issuer "shall be exempt from the requirement to furnish or file a Form 8-K if it instead disseminates the information through another method (or combination of methods) of disclosure that is reasonably designed to provide broad, non-exclusive distribution of the information to the public." (17 C.F.R. § 243.101(e)(2) (2012).) The NASDAQ information indicates that a "broadly disseminated press release" is one of several Regulation FD compliant methods of disclosure alternative to a Form 8-K.

[10] Defendants also cite *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1015 [113 Cal.Rptr.2d 625] (holding the filing of an SEC complaint clearly was protected as a communication to an official administrative agency designed to prompt action by that agency), as well as other cases dealing with the "issue of public interest" element of section 425.16 or general principles of defamation. (E.g., *Carver v. Bonds, supra*, 135 Cal.App.4th at p. 344 [explaining plaintiff bore burden of proving falsity because statements in question were consumer protection information and as such involved a matter of public concern]; *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1576–1577 [27 Cal.Rptr.3d 863] [posting of messages concerning Ampex, a publicly traded company, were a matter of public interest].)

Form 8-K is required to provide material information to the SEC (the termination or resignation of certain officers and other material information about the company's operations) irrespective of the existence or status of any SEC proceeding or investigation into Sequenom's T21 research and testing. More importantly, unlike in *Fontani*, Hawran's claims are not based on statements made in the Form 8-K, but those made in the September press release, which differ from those made in the Form 8-K. (See fn. 3, *ante*.) The press release provided information *to the public at large* as a supplement to Sequenom's regulatory disclosures; indeed, defendants' evidence, including the NASDAQ listing rule 5250 and NASDAQ "frequently asked questions," shows a press release is an *alternate* option to the Form 8-K of informing the public of material company information. (See 17 C.F.R. § 249.308 (2012) ["This form [(Form 8-K)] shall be used for the current reports required by Rule 13a-11 or Rule 15d-11 . . . and for reports of nonpublic information required to be disclosed by Regulation FD . . . ." (citations omitted)]. Application of the privilege to the press release does not serve its purpose to " ' "assure [the] utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrong-doing" ' " (*Hagberg, supra*, 32 Cal.4th at pp. 364–365) or allow free and open discussion for government deliberations. We see no reason to extend the official proceeding privilege to statements made in a press release that are merely related to the Form 8-K, which itself is "one step removed" from an official proceeding. (See *Romaneck v. Deutsche Asset Management, supra*, 2005 WL 2171987 at p. *7 [declining to apply the litigation privilege to statements related to, but not contained within, the defendant's form U-5 filing "which itself is one step removed from an official proceeding"].)

Having assessed the "critical question [of] the *aim* of the communication" as we must (*Hagberg, supra*, 32 Cal.4th at p. 368), the September press release does not meet the requirements of the official proceeding privilege. Defendants' evidence and arguments do not demonstrate that the assertedly defamatory statements within the September press release somehow achieved the object of, and had the necessary functional connection to, the SEC's investigation into Sequenom's T21 matters or even the SEC proceeding in general.

2. *Qualified Common Interest Privilege of Civil Code Section 47, Subdivision (c)*

Defendants also maintain the press release is qualifiedly privileged under the Civil Code section 47, subdivision (c) common interest privilege. Hawran asserts that defendants failed to raise the Civil Code section 47, subdivision (c) privilege in the trial court. However, because application of such a privilege is ordinarily a question of law (*Mann v. Quality Old Time Service, Inc.* (2004)

120 Cal.App.4th 90, 108 [15 Cal.Rptr.3d 215]) and the relevant facts concerning the scope of the September press release's distribution are undisputed, we may address it for the first time on appeal. (*Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1141 [91 Cal.Rptr.3d 864]; *C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1491–1492 [136 Cal.Rptr.3d 550].) Doing so, we conclude the privilege does not apply.

■ Section 47, subdivision (c) extends a conditional privilege against defamation to statements made without malice on subjects of mutual interests. (*Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1368 [7 Cal.Rptr.3d 216], citing *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1205 [31 Cal.Rptr.2d 776, 875 P.2d 1279].) This privilege is "recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest." (*Deaile v. General Telephone Co. of California* (1974) 40 Cal.App.3d 841, 846 [115 Cal.Rptr. 582].) The "interest" must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest. (*Rancho La Costa, Inc. v. Superior Court* (1980) 106 Cal.App.3d 646, 664–665 [165 Cal.Rptr. 347] [qualified privilege does not apply "merely because it relates to a matter which may have general public interest"].) Rather, it is restricted to "proprietary or narrow private interests." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 737 [257 Cal.Rptr. 708, 771 P.2d 406]; see *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914 [120 Cal.Rptr.2d 576].)

■ Here, as described by Clements (see fn. 8, *ante*), Sequenom's press release was disseminated to the PR Newswire, a wire service distribution vehicle, and, from there, to the world at large via numerous Internet sources, well beyond the "investing public" or those having a proprietary interest in the subject matter. Defendants urge us to nevertheless conclude that the qualified common interest privilege applies to Sequenom, which, defendants argue, like other publicly traded companies, issues the press releases "to comply with mandatory public disclosure obligations." They cite an unpublished opinion from a Delaware State Court of Chancery as "directly on point." While citing unpublished *federal* opinions does not violate the California Rules of Court (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 [72 Cal.Rptr.3d 112, 175 P.3d 1170]), there is no such allowance for unpublished opinions of other *state* courts. We decline to consider the case.

Had Hawran sued Sequenom for defamatory statements made in its Form 8-K filing to the SEC, he would have a stronger case to apply the Civil Code section 47, subdivision (c) privilege. However, Sequenom's Form 8-K met

both SEC and NASDAQ Regulation FD disclosure obligations. The accompanying press release, one of several alternate and optional methods of disclosure to the public (see fn. 9, *ante*), is not mandatory, and was so widely disseminated as to, in our view, defeat the privilege's purpose.

 Even if Sequenom's press release is deemed to further a common interest to the general public, Hawran may still defeat the qualified privilege by demonstrating the September press release statements were made with malice. (See *Lundquist v. Reusser, supra*, 7 Cal.4th at p. 1196.) " ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds, for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights [citations]." ' " (*Taus v. Loftus, supra*, 40 Cal.4th at p. 721.) The import of the September press release statements differ from those in Sequenom's Form 8-K filing of the same day, in that the Form 8-K states only that Hawran had informed Sequenom of his resignation, and then on a different, subsequent page, discusses the officers and employees in whom the board "lost confidence," without expressly mentioning Hawran. (See fn. 3, *ante*.)

We view these differences in conjunction with Hawran's opposing declaration, in which he averred that prior to Sequenom's issuance of the September press release, he had complained about questionable corporate decisions and proposals made by Hixson, raising Hixson's ire. Specifically, Hawran averred that in mid-2008, prior to issuance of the September press release, Hawran raised objections to a board member compensation program proposed by Hixson (to elect to receive Sequenom stock or options using a heavily discounted valuation in lieu of their annual compensation) that in Hawran's perception constituted inappropriate self-dealing by the board members. According to Hawran, Hixson did not address his concerns, told him to "keep quiet" and it was "none of your affair," and became "noticeably upset" with Hawran for opposing the compensation plan. At other times in 2008 and 2009, Hawran raised issues concerning the competence and tax reporting of certain members of Sequenom's audit committee. According to Hawran, Hixson "expressed his outrage with me for questioning the Board's judgment," and attempted without any basis to blame him for the tax issue and false certifications filed by the board member, which had occurred before Hawran's arrival at Sequenom.

In view of the standard required for Hawran to meet his burden, and drawing all inferences in his favor, we conclude there is enough circumstantial evidence to support a prima facie case that malice motivated the statements made concerning Hawran in the September press release.

### 3. *Hawran Demonstrated a Probability of Prevailing on His Defamation-related Claims*

A viable defamation claim requires the existence of a provable falsehood. (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 [64 Cal.Rptr.3d 467]; *Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1349 [78 Cal.Rptr.3d 244]; *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048 [72 Cal.Rptr.3d 210].) " ' "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot ' "reasonably [be] interpreted as stating actual facts" about an individual.' [Citations.] Thus, 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection. [Citations.]" [Citation.]' " (*Nygård*, at p. 1048.)

Though mere opinions are generally not actionable (*Taus v. Loftus, supra*, 40 Cal.4th at p. 720), a statement of opinion that implies a false assertion of fact is (*McGarry v. University of San Diego, supra*, 154 Cal.App.4th at p. 112 [" '[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications' [citation] because a speaker may still imply 'a knowledge of facts which lead to the [defamatory] conclusion' "], quoting *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18–19 [111 L.Ed.2d 1, 110 S.Ct. 2695] (*Milkovich*); *Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1260 [119 Cal.Rptr.3d 127] (*Overhill Farms*); *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471 [37 Cal.Rptr.3d 133] ["An opinion . . . is actionable only ' "if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false." ' "]).

Thus, our inquiry is not merely whether the statements are fact or opinion, but " 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' " (*McGarry v. University of San Diego, supra*, 154 Cal.App.4th at p. 113.) We apply a " 'totality of the circumstances' " test to determine both whether (a) a statement is fact or opinion, and (b) a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260, 266 [228 Cal.Rptr. 206, 721 P.2d 87]; *Overhill Farms, supra*, 190 Cal.App.4th at p. 1261; see *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385–386 [10 Cal.Rptr.3d 429].) "Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.' " (*Franklin*, at pp. 385–386, quoting *Baker*, at

pp. 260–261.) Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. (*Overhill Farms*, at p. 1261; *Nygård, Inc. v. Uusi-Kerttula, supra*, 159 Cal.App.4th 1027, 1048–1049.)

Defendants advance several arguments that Hawran has not made out a prima facie case that the press release's statements are defamatory. We reject one outright: that Hawran did not demonstrate injury to his reputation with admissible evidence. As we explain more fully below, reading the targeted statements in the entire context of the September press release, their defamatory meaning is plain on the face of the document, and thus such proof is unnecessary. (*Finney v. Lockhart* (1950) 35 Cal.2d 161, 163 [217 P.2d 19]; *Clark v. McClurg* (1932) 215 Cal. 279, 284 [9 P.2d 505]; *McGarry v. University of San Diego, supra*, 154 Cal.App.4th at p. 112; *Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 382 [226 Cal.Rptr. 354] [damage to plaintiff's reputation is conclusively presumed to result from a statement that is libelous per se; the plaintiff need not introduce evidence of actual damages to obtain an award of damages].)

Defendants also argue there is no proof the majority of the defamatory statements were made, but point out Hawran conceded that issue below. The parties appear to agree only three statements are at issue: that (1) Hawran denied wrongdoing; (2) the SLC's investigation raised serious concerns; and (3) those concerns resulted in a loss of confidence by the independent members of the board in "the personnel involved." Defendants contend the latter two statements are inactionable opinion or alternatively true. As to the first, they maintain the statement that Hawran "denied wrongdoing" is not defamatory because it does not impugn Hawran's reputation.

■ Looking to the totality of the circumstances as we must, we examine the allegedly defamatory statements of the September press release, as well as the context in which the press release was issued, to determine whether Hawran satisfied his burden of providing a prima facie showing the press release contains actionable, provably false assertions of fact. (*Balzaga v. Fox News Network, LLC, supra*, 173 Cal.App.4th at pp. 1337–1338; *Overhill Farms, supra*, 190 Cal.App.4th at p. 1261.) " '[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole.' [Citation.] 'This is a rule of reason. Defamation actions cannot be based on snippets taken out of context.' " (*Balzaga*, at p. 1338.)[11]

---

[11] Defendants urge us to analyze defamatory meaning by first isolating each statement without considering its context. They maintain that if each isolated statement amounts to mere opinion, or is true, then we must end the analysis without considering the press release as a whole. This is not a proper application of the totality of the circumstances test. In *Balzaga v. Fox News Network, LLC, supra*, 173 Cal.App.4th at page 1338, we applied the test to an allegedly

First, we disagree with defendants' arguments that the press releases' statements are merely inactionable opinion. They are not phrased as mere impressions. (See *Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 261–262 [reasonable person would understand a statement beginning with the phrase, " '[m]y impression is . . . .' " as a statement of opinion rather than fact].) They are not phrased in terms of apparency, cautiously or otherwise. (See *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 599, 603 [131 Cal.Rptr. 641, 552 P.2d 425] [company bulletin and letter's statements about union leaders' " 'apparent eagerness' " and " 'apparent self-interests' " were "cautiously phrased in terms of apparency" and were not of a factual nature or of a type calculated to induce the audience to understand they were factual], disapproved on other grounds in *Milkovich, supra,* 497 U.S. 1 as noted in *Edwards v. Hall* (1991) 234 Cal.App.3d 886, 906 [285 Cal.Rptr. 810]; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 727–728 [81 Cal.Rptr.3d 406].) They were not evaluative statements made in an employee performance review. (E.g., *Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 964, 970–971 & fn. 3 [18 Cal.Rptr.2d 83] [statements were made in company performance evaluation and development plan but none of them suggested the plaintiff "lacked honesty, integrity or the inherent competence, qualification, capability or fitness to do his job"; the court reasoned "the word 'evaluation' denotes opinion, not fact" and the purpose of the document was "as a management tool for examining, appraising, judging and documenting the employee's performance"].)

The statements at issue here—that Sequenom "has obtained the resignation of . . . Paul Hawran . . ."; that each of "these officers and employees,"

---

defamatory television broadcast, and in undertaking that analysis, we stated: "In reviewing an alleged defamatory meaning, ' "the context in which the statement was made must be considered . . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. [Citation.] ' "[T]he publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope [of the publication]." ' " ' " Nor was defendants' asserted analysis the test conducted in *Franklin v. Dynamic Details, Inc., supra,* 116 Cal.App.4th 375. In *Franklin,* the court held that two of three e-mails claimed to be defamatory were opinion. (*Id.* at p. 388.) But this did not end the court's inquiry. The court proceeded to *also* consider the context in which they were made—" 'the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed' "—to decide if they implied a provably false factual assertion. (*Id.* at p. 389 ["In determining whether the first two e-mails implied a provably false factual assertion, *we must also consider the context in which the e-mails were made.*" (italics added)], citing *Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260–261 and *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724–725 [275 Cal.Rptr. 494].) In *Franklin,* the "circumstances in which the e-mails were prepared, sent, and understood" supported the court's conclusion the e-mails contained protected opinion. (*Franklin,* 116 Cal.App.4th at p. 389.)

including Hawran, has "denied wrongdoing"; and that the SLC investigation has raised serious concerns "resulting in a loss of confidence [in the personnel involved] by the independent members of the company's board of directors"—are not invectives or loose figurative terms, but statements of matters that can be proven or disproven concerning Sequenom's business decisions and the consequences of the SLC's investigation.

Further, the statements are made in a press release that was intended to supplement mandatory SEC disclosures. Such formalized statements in press releases are usually intended to be factual, as opposed to rhetorical, persuasive, or evaluative. (See, e.g., *Global Telemedia Internat., Inc. v. Doe 1* (C.D.Cal. 2001) 132 F.Supp.2d 1261, 1267 [postings on an Internet message board were "full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents, such as corporate press releases or SEC filings" and thus lacked "the formality and polish typically found in documents in which a reader would expect to find facts"]; accord, *ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th 993, 1011–1012 [citing *Global Telemedia*].)

To examine the context more fully, the September press release was distributed after Sequenom's prior discovery of problems with its T21 program, and describes company developments, which are inherently factual matters. Specifically, the press release reports the results of the SLC's independent investigation into the problems, stating that the SLC had concluded Sequenom "failed to put in place adequate protocols and controls for the conduct of studies in the Trisomy 21 program"; that "[c]ertain of the company's employees also failed to provide adequate supervision"; that without such controls and supervisions, the test data and results "included inadequately substantiated claims, inconsistencies and errors"; and that due to deficiencies in the company's disclosure controls and procedures, in some cases the inadequate test data and results were reported to the public in press releases and other public statements. The press release states that at the SLC's recommendation, the board had begun implementing "remedial measures, including: [¶] . . . [¶] . . . changes in the company's organizational and reporting structure . . . ."

In the next paragraph, the document reports Sequenom terminated the employment of its president, CEO, and vice-president of research and development. The press release then makes the statements at issue: that it "obtained [Hawran's] resignation" and that of one other employee, it terminated the employment of three other employees, and "[w]hile *each of these officers and employees* has denied wrongdoing, the *special committee's investigation* has raised serious concerns, resulting in a loss of confidence by the independent members of the company's board of directors *in the personnel involved.*" (Italics added.)

To an average person reading the entirety of the press release (*Baker v. Los Angeles Herald Examiner, supra*, 42 Cal.3d at pp. 260–261; *Balzaga v. Fox News Network, LLC, supra*, 173 Cal.App.4th at p. 1339), the damaging implication is apparent: Sequenom sought and obtained Hawran's resignation because Hawran was among the group of officers and employees somehow involved or responsible for the identified failures and deficiencies of the T21 program and failed company procedures. The statements suggest that Sequenom possessed undisclosed, and provably false, facts concerning what Hawran actually did or did not do at Sequenom to implicate him in the wrongdoing. (See *Mamou v. Trendwest Resorts, Inc., supra*, 165 Cal.App.4th at p. 728.)

■ Defendants maintain that even assuming these statements are actionable statements of fact, Hawran cannot prove they are false. They correctly point out that truth is a complete defense to a defamation claim. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 646–647 [85 Cal.Rptr.2d 397].) Defendants point to Hixson's statement that he told Hawran that Sequenom had serious concerns and had lost confidence in him. Hawran ultimately admitted in opposition to the motion that it was literally true that Hixson told him in a meeting that Sequenom's board had lost confidence in him. But even if a statement is literally accurate, defamation may be proven if it has a false implication. (*Kapellas v. Kofman, supra*, 1 Cal.3d at p. 33.) Here, Hawran denied committing any wrongdoing with the purported mishandling of scientific data. He denied being informed during the SLC's investigation or presented with any evidence suggesting he had been accused of wrongdoing (see discussion of the evidence in pt. V.C., *post*). Hawran's denials are bolstered by Sequenom's Form 8-K filing, which does not directly suggest that Hawran was among the personnel in whom Sequenom lost confidence. All of this evidence, combined with Hawran's assertions about his prior whistleblower-type complaints concerning other Sequenom board members and Hixson's proposed compensation program, suggests Sequenom may have had motives to obtain Hawran's resignation other than his conduct in connection with the T21 problems. This sort of factual dispute is one that we do not resolve on defendants' section 425.16 special motion to strike. (*Taus v. Loftus, supra*, 40 Cal.4th at p. 714 [court does not weigh evidence or assess the credibility of the declarations in support of the anti-SLAPP motion].)

As we have stated, Hawran need only demonstrate a prima facie showing of facts to sustain a favorable judgment if his evidence is credited. (*Taus v. Loftus, supra*, 40 Cal.4th at pp. 713–714.) We conclude Hawran met the requisite burden to show the falsity of the targeted statements. Defendants' evidence does not establish as a matter of law the complete defense of truth so as to defeat Hawran's evidentiary showing. (*Id.* at p. 714.)

### C. *Breach of Contract Against Sequenom*

Hawran's breach of contract cause of action is based on the parties' asserted oral agreement that in Sequenom's forthcoming press announcement, it would separate Hawran from the wrongdoers and not implicate him in any wrongdoing in connection with his resignation. In opposition to defendants' motion, Hawran averred that in September 2009 he was offered the opportunity to resign in exchange for fair and honest treatment in any subsequent press release. He states: "Specifically, I was informed that if I were to resign, I would be distinguished in the press release from the purported wrongdoers such that there would be no implication of wrongdoing connected with my resignation."[12] He avers that in reliance on that offer, he agreed to resign to save his good name and standing in the biotech community and did so on September 25, 2009.

Defendants contend Hawran cannot establish a probability of prevailing on his breach of contract cause of action because the contract (1) is illegal and void as a "contract to misrepresent facts"; (2) was fully performed because the press release fairly and honestly stated that Sequenom had lost confidence in management, that Hawran denied culpability, and that Hawran resigned; (3) was not actually bargained for or created; (4) is inadmissible under Evidence Code section 1152; and (5) is unenforceable as an oral contract contrary to the parties' agreement to be bound in writing.

To accept defendants' first, second, third and fifth assertions—that the oral contract was illegal or fully performed, there was no bargained-for promise, or that Hawran's resignation was intended to be the subject of a written contract—would require that we resolve conflicting evidence created by Hawran's and Hixson's respective declarations concerning the circumstances surrounding and terms of Hawran's resignation. In part, Hixson averred he told Hawran he "believed it to be a certainty that the Board would, at [an upcoming September 21 meeting], formally determine that it has lost confidence in his judgment and leadership of the company, and elect to terminate him." Hixson further stated that at no point did he and Hawran discuss

---

[12] Hawran offered the declaration of his personal counsel, Nicholas, to the same effect, who said: "In September of 2009, prior to both Paul Hawran's resignation and the issuance of the September 28, 2009 press release, I spoke to Richard Paul, Esq., counsel for Sequenom regarding Sequenom's request for Mr. Hawran to resign. During this telephone conference, Richard Paul specifically informed me that if . . . Hawran would resign from the company, Sequenom would treat him fairly and honestly in any future press releases by distinguishing Mr. Hawran from the purported wrongdoers such that there would be no implication of wrongdoing connected with Mr. Hawran's resignation." The trial court overruled defendants' hearsay and Evidence Code section 1152 objections to both Hawran's and Nicholas's statements. Defendants do not renew their hearsay objections to this evidence on appeal, thus waiving any hearsay challenge. (*Overhill Farms, supra,* 190 Cal.App.4th at p. 1271.)

language for inclusion in the Form 8-K or press release, or how his separation would be described to the public. Hixson described the terms of resignation he imparted to Hawran, then stated, "The foregoing were the terms I proposed be included in a written agreement if [Hawran] elected to resign. I clearly contemplated a specific, written document be the actual agreement, so that it was clear what, if anything, was being agreed to between the parties."

But in his opposing declaration, Hawran averred that at no point during the SLC's investigation was he informed or presented with any evidence suggesting he was accused of or committed any wrongdoing. He stated, "This is because I never committed any wrongdoing with the purported mishandling of scientific data." He further asserted the September press release's statement that he had denied wrongdoing was factually false because at no point had he been accused of any wrongdoing to have denied it. In short, Hixson's declaration creates a factual dispute by contradicting Hawran's assertions as to the content and nature of the parties' discussion and agreement.

It is not our role to resolve such evidentiary conflicts on defendants' section 425.16 motion. Rather, as stated, this court accepts the truth of Hawran's evidence in assessing whether he presented a probability of prevailing on the merits of his breach of contract claim. We evaluate defendants' showing only to determine if it defeats Hawran's showing as a matter of law (*Soukup, supra*, 39 Cal.4th at p. 269, fn. 3; *Kashian v. Harriman, supra*, 98 Cal.App.4th at p. 906), and conclude based on the factual disputes it does not. Defendants' assertion as to illegality, which is based on the theory that it would be unlawful to perpetrate a fraud on the public, would require us to ignore Hawran's evidence as to the nature of his agreement with Sequenom, namely, that he would not be publicly implicated in any wrongdoing by the company in its forthcoming press release. The same is true with regard to defendants' arguments concerning full performance and the absence of a bargain.

As to defendants' last point, even if we were to accept defendants' evidence that Hixson contemplated a written resignation agreement, Hixson's declaration does not establish *Hawran also agreed* not to be bound unless a writing was executed, as defendants' cited authorities require. (See *Spinney v. Downing* (1895) 108 Cal. 666, 668 [41 P. 797] [evidence was "without conflict that it was the understanding and agreement between the plaintiff and [defendant] that the proposed contract should be reduced to writing, and signed by both parties"]; *Stromer v. Browning* (1966) 65 Cal.2d 421, 427, fn. 2 [55 Cal.Rptr. 18, 420 P.2d 730] [parties "agree[d] that no one would be bound until written documents were executed"]; *Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 358 [72 Cal.Rptr.2d 598] [where written contract provision and other evidence indicates "both parties contemplated that acceptance of the contract's terms would be signified by signing it,

the failure to sign the agreement means no binding contract was created"]; accord, *Kreling v. Walsh* (1947) 77 Cal.App.2d 821, 834–835 [176 P.2d 965].) Defendants have not shown the alleged oral agreement is unenforceable as a matter of law by virtue of any failure to reduce it to a signed writing.

Finally, we are not persuaded by defendants' argument that the alleged oral contract and underlying statements are inadmissible under Evidence Code section 1152 as "privileged" settlement communications. Citing the declaration of their attorney of record Richard Paul, defendants assert that the context of the conversation between Attorney Paul and Hawran's attorney, Nicholas, was a discussion of Hawran's threatened wrongful termination lawsuit, which is grounded on the same claims as the present case. They argue the trial court here impermissibly "allowed Hawran to use a statement made in an effort to settle a claim for reputational damage in connection with termination to form the basis of another reputational damage suit against the same parties based on the same facts and same alleged injury to reputation." The trial court had rejected application of the evidentiary privilege, ruling Hawran "is not attempting to offer this testimony to prove defendants' liability for [his] loss or damages related to [Hawran's] contemplated wrongful termination claim; he is offering this testimony to show the terms of a separate agreement."

Evidence Code section 1152, subdivision (a), provides: "Evidence that a person has, in compromise . . . furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained . . . or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." Though defendants characterize this principle as a privilege, it is in fact a rule of evidence subject to review for abuse of discretion on defendants' section 425.16 motion. (*Covell v. Superior Court* (1984) 159 Cal.App.3d 39, 42 [205 Cal.Rptr. 371]; see *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1491 [43 Cal.Rptr.3d 723] [Evid. Code, § 1152 is not an absolute bar to liability since a settlement document may be admissible for a purpose other than proving liability]; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 32 [24 Cal.Rptr.3d 233] [abuse of discretion standard applies to trial court's ruling on admissibility of evidence under Evid. Code, § 1152]; *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1348 [63 Cal.Rptr.3d 798] [abuse of discretion standard applies to evidentiary objection in connection with special motion to strike].)

Accepting defendants' evidence that Nicholas and Paul were negotiating a compromise of a wrongful termination claim asserted by Hawran, the statements of Hawran and Nicholas at issue were admitted not to demonstrate

defendants' liability for wrongful termination, but to establish a binding agreement had been reached regarding the terms of Hawran's resignation for purposes of a different, subsequent, breach of contract claim. Evidence Code section 1152 only prohibits "the introduction into evidence of an offer to compromise a claim for the purpose of proving liability for *that claim*." (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 396 [89 Cal.Rptr. 78], some italics omitted; see *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 887 [221 Cal.Rptr. 509, 710 P.2d 309] [admitting settlement offer not to prove liability for loss, but to prove breach of covenant of good faith and fair dealing], superseded by Ins. Code, § 12340.11 on other grounds; *Fieldson Associates, Inc. v. Whitecliff Laboratories, Inc.* (1969) 276 Cal.App.2d 770, 772–773 [81 Cal.Rptr. 332] [letters claimed to be privileged under Evid. Code, § 1152 were not used to prove either liability for, or invalidity of, the claim concerning which the offer of compromise was made, but rather were received to show the invalidity of a different claim]; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1478–1480 [69 Cal.Rptr.3d 273].) In sum, defendants' evidence does not as a matter of law negate Hawran's ability to present prima facie facts to sustain a favorable judgment on his breach of contract claim.

## DISPOSITION

The order is affirmed. The parties shall bear their own costs on appeal.

McIntyre, Acting P. J., and Irion, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied December 19, 2012, S206167.