Filed 12/27/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| STEVEN A. SUGARMAN et al., | B308318 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCV36697) |
| v. | |
| CHRISTOPHER L. BROWN, | |
| Defendant and Respondent; | |
| J. FRANCISCO TURNER, | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Gregory Wilson Alarcon, Judge. Order on defendant Brown's motion affirmed; order on defendant Turner's motion affirmed in part and reversed in part.

---

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part 2 of the Discussion.

Anderson Kill California, Bridget B. Hirsch, Erik I. Jackson; Anderson Kill and Cozen O'Connor, Jeremy E. Deutsch and Christian V. Cangiano for Plaintiffs and Appellants.

O'Melveny & Myers, William K. Pao and David L. Iden for Defendant and Appellant.

Foley & Lardner, Samuel J. Winer, Adrian L. Jensen, Kathryn Shoemaker and Tony Tootell for Defendant and Respondent.

---

**SUMMARY**

Plaintiff Steven A. Sugarman sued Banc of California, several individual directors and Banc executives, and Banc's lead auditor, in the wake of a scandal that led to plaintiff's resignation from his positions at Banc in January 2017. All the defendants filed anti-SLAPP (strategic lawsuits against public participation, Code Civ. Proc., § 425.16) motions to strike various of the 12 causes of action plaintiff alleged. (Further statutory references are to this section of the Code of Civil Procedure unless otherwise specified.)

These appeals are from rulings on two of the motions: one by the auditor, defendant Christopher L. Brown (the Brown order), and one by defendant J. Francisco A. Turner, Banc's interim president and chief financial officer (CFO) until he too left Banc, and the banking industry, in June 2017 (the Turner order). Banc, and the other individual directors and executives as a group, also filed anti-SLAPP motions that are the subject of a separate appeal. (*Sugarman v. Benett* (Dec. 27, 2021, B307753).)

In the published portion of our opinion, we affirm the Brown order granting defendant Brown's motion in part. We hold

2

statements in an annual 10-K report filed with the Securities and Exchange Commission (SEC) constitute statements "made in connection with an issue under consideration or review by [an] official proceeding" under section 425.16, subdivision (e)(2). In the nonpublished portion of our opinion, we affirm the Turner order in part and reverse it in part, concluding the trial court should have granted defendant Turner's motion in its entirety.

FACTS

### 1. The Parties

Plaintiff is the former chairman of the board, president and chief executive officer (CEO) of defendants Banc of California, Inc., and Banc of California, N.A. (Banc). He resigned his positions at Banc on January 23, 2017. The Steven and Ainslie Sugarman Living Trust, a revocable living trust and stockholder in Banc, is also a plaintiff. For convenience, we refer to both Mr. Sugarman and the trust in the singular as plaintiff.

Plaintiff sued defendants in connection with their conduct after plaintiff's resignation. Mr. Turner was interim CFO of Banc, and also became interim president when plaintiff resigned. (He was not a director.) He resigned and left the banking industry on June 12, 2017. Mr. Brown was employed by the accounting firm KPMG, Banc's outside auditor, and was the lead audit partner for Banc's 2016 fiscal year.

The other seven named defendants are or were members of Banc's board of directors or officers of Banc. The parties refer to these defendants (and Mr. Turner) as the Banc individuals, and to Banc and these defendants collectively as the Banc defendants.

### 2. The Complaint

The operative complaint spans 166 pages, plus more than 600 pages of attached exhibits. Plaintiff alleged 12 causes of

3

action.  The seven causes of action at issue in these appeals fall into four categories:  (1) fraudulent inducement and negligent misrepresentation to induce holder to hold securities (the inducement claims); (2) preventing subsequent employment by misrepresentation (blacklisting) and tortious interference with prospective economic advantage; (3) unfair competition and conspiracy to engage in unfair competition (the UCL claims; Bus. & Prof. Code, § 17200 et seq.); and (4) defamation.

The complaint alleges that plaintiff reported wrongdoing and self-dealing by defendant Halle Benett and others at Banc, and then he resigned, after the director defendants refused to address the wrongdoing (described at length in the complaint).  A separation agreement provided severance payments in exchange for mutual releases of all potential claims that existed as of January 23, 2017.  Defendants immediately launched a campaign to attack plaintiff in order to conceal their wrongdoing, dissuade him from selling his Bank stock, and harm his ability to compete with defendants.

In addition to concealing "numerous illegal acts" and breaching various contracts, defendants "also have hidden from [plaintiff] the true state of Banc's business including its cratering financial performance since his departure," and took various actions "to obscure the devastating effects their illegal actions had on Banc's business, financial performance and prospects. Defendants made their false representations in order to harm [plaintiff] including in order to induce [plaintiff] to hold his Banc securities in reliance on the false information, promises, and disclosures."  The complaint alleges defendants "have conducted a coordinated campaign . . . to further their Cover Up, to damage [plaintiff's] reputation with a barrage of vindictive, untrue, and

4

harmful actions; to publish and distribute false and misleading information intended to present [plaintiff] in a negative light; and to scapegoat [plaintiff] for their wrong-doing and [m]isconduct which has resulted in tens of millions of dollars of damages to [plaintiff]."

We will describe the allegations in more detail in our legal discussion.

## 3. Background Facts

As might be expected, plaintiff and defendants paint a very different picture of the circumstances surrounding plaintiff's resignation and the aftermath. Some background facts are not open to dispute.

Plaintiff is a prominent businessman and entrepreneur in California and headed Banc from 2013 until January 2017.

On October 18, 2016, an anonymous blogger made allegations of wrongdoing against Banc and senior officers and directors at Banc, claiming they had extensive ties to notorious fraudster Jason Galanis, who was known for secretly gaining control of financial institutions and other public companies and looting their assets. The blog post concluded Banc was "simply un-investible." Plaintiff was prominent among the officers and directors named in the blog post.

That same day, Banc published a press release announcing it was aware of the allegations posted; the board, acting through its disinterested directors, had previously begun a thorough independent investigation of claims of an affiliation between Galanis and company personnel; the board had received regular reports over the last year from the law firm leading the investigation; and certain claims of affiliations made by Galanis

5

concerning a company in which plaintiff had an interest were fraudulent.

Three months later, on January 23, 2017, Banc issued two more press releases. One announced a new chairman of the board (defendant Sznewajs) and plaintiff's resignation. The other provided an update on the independent investigation into the blog post allegations. It stated that, in response to the allegations in the blog post, the board formed a special committee that began a process to review the allegations. On October 27, 2016, Banc's independent auditor, KPMG, sent a letter "raising concerns about allegations of 'inappropriate relationships with third parties' and 'potential undisclosed related party transactions.' " On October 30, 2016, the special committee hired a law firm with no prior relationship with Banc to conduct an independent investigation of the issues raised by the blog post and questions raised by the KPMG letter.

The press release further stated the inquiry had determined that Banc's initial October 18, 2016 press release contained inaccurate statements. While an investigation had been conducted before the blog post appeared, "it appears to have been directed by Company management rather than any subset of independent directors," and the press release did not disclose that the law firm conducting the investigation had previously represented both Banc and plaintiff individually. (A declaration from a lawyer for the Banc individuals states that plaintiff ordered the October 18 press release to be published; plaintiff's declaration states others at Banc drafted and disseminated the release.)

The press release reported that on January 12, 2017, the SEC "issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing," and

6

subpoenaed documents from Banc, "primarily relating to the October 18, 2016 press release and associated public statements."

The January 23, 2017 press release also announced changes in corporate governance policies, including separating the roles of board chair and CEO, and indicated Banc was "in the process of preparing a more rigorous policy to govern review and approval of proposed related party transactions."

Also on January 23, 2017, the first of several class action complaints was filed, alleging violation of federal securities laws, naming Banc, plaintiff, and two other defendants. The complaint described the blog post and ensuing events, and alleged false or misleading communications to investors and failures to disclose material information relating to the blog post investigation.

On February 9, 2017, the law firm conducting the independent investigation for the special committee reported that its inquiry found no evidence Jason Galanis had any control or undue influence over Banc.

More than two and a half years later, on September 15, 2019, the lead plaintiff in the securities litigation agreed to dismiss Mr. Sugarman with prejudice. The agreement states the class action plaintiff found no proof Galanis had any control over Mr. Sugarman or affected his actions, and the October 18, 2016 press release reflected information provided to Mr. Sugarman. The agreement provided the dismissal with prejudice was to become effective upon approval of the agreement as well as a settlement with Banc.

A month later, plaintiff filed the complaint in this case. Several weeks after that, plaintiff was voluntarily dismissed, without prejudice, from Banc stockholder derivative litigation.

7

On December 20, 2019, the SEC concluded its investigation of plaintiff, with no action being taken.

**4.     The Anti-SLAPP Motions and Rulings**

This appeal concerns only the separate anti-SLAPP motions brought by Mr. Turner and Mr. Brown. We will describe the motions, relevant facts and rulings in the separate legal discussions of the Brown and Turner motions.

The trial court granted Mr. Brown's motion to strike allegations that concerned Mr. Brown's sign-off representation as lead auditor in Banc's 2016 audit report. The court granted Mr. Turner's motion to strike plaintiff's fraudulent inducement and reputational harm causes of action, and denied Mr. Turner's motion to strike plaintiff's UCL causes of action.

Plaintiff appealed from the Brown order, and from the Turner order striking the inducement and reputational harm claims. Mr. Turner appealed from the Turner order denying his motion to strike the UCL claims.

**DISCUSSION**

The anti-SLAPP statute and procedures have been described many times.

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) When ruling on an anti-SLAPP motion, the trial court employs a two-step process. The moving defendant bears the initial burden of establishing that the challenged allegations or claims " ' "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims

8

have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)

In making these determinations, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) "As to the second step, a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

Our review is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

## 1. Mr. Brown's Anti-SLAPP Motion

Plaintiff alleged two causes of action against Mr. Brown based on the same facts. Plaintiff alleged Mr. Brown made misrepresentations that induced plaintiff to hold his Banc common stock and warrants. The misrepresentations alleged were of two types.

First, plaintiff alleged misrepresentations in January 2017 (before he resigned), that Mr. Brown made directly to him, that Mr. Brown would conduct a thorough investigation of plaintiff's allegations of wrongdoing, and KPMG would not certify Banc's financials until ensuring the disclosures were accurate and truthful.

The second kind of misrepresentation was Mr. Brown's "sign-off representation" in the audit report. The complaint alleged plaintiff was "induced to hold his Banc securities because of representations by Defendant Brown including his personal sign off as lead audit partner on the Banc's 2016 fiscal year financial

9

audit on March 1, 2017," and further referred to the "March 1, 2017 Form 10K attaching the financial statements with Defendant Brown's knowingly false audit report," all attached to the complaint.

Mr. Brown sought to strike both causes of action in their entirety. The trial court granted Mr. Brown's motion in part.

The court found Mr. Brown did not show the direct representations he made to plaintiff in January 2017 were protected activity. Mr. Brown's sign-off representation in the audit report, however, was a statement included in a 10-K annual report filed with the SEC, and thus was protected activity as a statement made "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)).

Further, the court found plaintiff did not show a probability of prevailing on his claim. Plaintiff instead argued (contrary to the allegation in his complaint just quoted) that the audit report was *not* the misrepresentation on which he relied; he complained only of the January 2017 personal statements made directly to him; and the audit report was merely "evidence which misled Sugarman to believe that Brown actually followed through on his January 2017 assurances." The trial court rejected this contention.

Mr. Brown does not challenge the court's ruling that he did not establish his direct statements in January 2017 were protected activity. The only issue on appeal is Mr. Brown's sign-off representation in the audit report. We conclude the representations in the audit report were protected activity, and plaintiff failed to show a probability of prevailing on his claim.

10

### a.     Protected activity

Plaintiff argues first that Banc's 10-K, containing Banc's 2016 fiscal year financial audit dated March 1, 2017—and Mr. Brown's sign-off on that audit—is not protected activity. Plaintiff cites no authority for that proposition, and instead contends the precedent the trial court relied on—*Hawran v. Hixson* (2012) 209 Cal.App.4th 256 (*Hawran*)—does not support it.  We think otherwise.

The categories of activity protected under the statute appear in section 425.16, subdivision (e).  They include any written or oral statement or writing (1) "made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" or (2) "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" or (3) "made in a place open to the public or a public forum in connection with an issue of public interest," or (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16. subd. (e)(1)–(4).)

In *Hawran*, "the trial court found [the defendant company's] Form 8-K put the issues identified in the form under consideration or review by the SEC," and that the company's press release, "from which [the plaintiff's] claims arose, was thus protected as a writing 'made in connection with an issue under consideration or review by . . . any other official proceeding authorized by law,' " quoting subdivision (e)(2).  (*Hawran, supra,* 209 Cal.App.4th at p. 269.)  The Court of Appeal continued:  "This finding alone subjects [the plaintiff's] claims to section 425.16."  (*Ibid.*)  But the court went on to indicate that the plaintiff stated he would not challenge the trial

11

court's finding that his claims fell within subdivision (e)(2) (instead contending unsuccessfully that the commercial speech exception applied). Consequently, the court stated it "need not reach the correctness of that finding." (*Hawran,* at p. 270.) Later, however, in a discussion of the fair reporting privilege, the court observed that the Form 8-K "was filed for the purpose of complying with the SEC's mandatory disclosure requirements," and "may constitute a writing before an official proceeding," citing *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 731-732 (*Fontani*).[1] (*Hawran,* at p. 281.)

In *Fontani,* the court held that the defendant's report to the National Association of Securities Dealers (NASD) on a Form U-5, describing the reasons for the plaintiff's termination, was protected activity under subdivision (e)(1) of the statute (statements made "before . . . [an] official proceeding authorized by law"), and under subdivision (e)(4) (any other conduct in connection with an issue of public interest). (*Fontani, supra,* 129 Cal.App.4th at pp. 725, 728.) The court concluded the NASD was "a regulatory surrogate for the SEC," and "[b]ecause at least one purpose of a Form U-5 is to trigger a regulatory investigation where warranted [citation], the NASD requires and receives [Form U-5's] from members in its role as the primary regulatory body of the broker-dealer industry." (*Id.* at p. 729.) Further, "the NASD is the type of regulatory body before which communication is routinely protected by the anti-SLAPP law." (*Id.* at p. 730.)

In *Fontani,* the plaintiff argued that "not every communication related to an official body, no matter how

---

[1]     *Fontani* was disapproved on other grounds in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, footnote 5.

tangential that relation may be, qualifies as being made before an official proceeding under the anti-SLAPP law." (*Fontani, supra,* 129 Cal.App.4th at p. 731.) The court said that argument did not apply in the case before it, because subdivision (e)(1) "encompasses communications designed to prompt official action," and "an NASD investigation is at least one potential consequence of a Form U-5 filing that contains allegations of improper conduct by a broker-dealer." (*Fontani,* at p. 731.) The court concluded the Form U-5 was therefore a communication made in anticipation of the bringing of an official proceeding, and "constitute[d] a communication before an official proceeding authorized by law under section 425.16, subdivision (e)(1)." (*Id.* at p. 732.)

*Fontani* also concluded that the defendant's statement to the NASD "concerned possible conduct capable of affecting a significant number of investors," and consequently "the Form U-5 contents concerning [the plaintiff's] purported misconduct . . . concern a matter of public interest under section 425.16, subdivision (e)(4)." (*Fontani, supra,* 129 Cal.App.4th at p. 733.)

Neither *Hawran* nor *Fontani* directly addresses whether statements in an annual 10-K report filed with the SEC constitute statements "made in connection with an issue under consideration or review by [an] official proceeding" under subdivision (e)(2). But we think that is necessarily so given the SEC's mandatory disclosure and review requirements. The SEC is required by law to review disclosures made by issuers of securities, "including reports filed on Form 10-K," "on a regular and systematic basis" and no less frequently "than once every 3 years." (15 U.S.C. § 7266, subds. (a) & (c).) "Such review shall include a review of an issuer's financial statement." (15 U.S.C. § 7266, subd. (a).) In our view, this alone subjects plaintiff's claims against Mr. Brown to the

13

anti-SLAPP statute. Moreover, in this case the audit report in the 10-K specifically addressed the October 2016 blog post and Banc's subsequent actions—matters that were, as the audit report indicated, then under investigation by the SEC. Under these circumstances, we conclude the audit report statements in the 10-K filing qualify for anti-SLAPP protection as statements "made in connection with an issue under consideration or review" by the SEC. (§ 425.16, subd. (e)(2).)

Plaintiff contends that his claims against Mr. Brown did not arise from the audit report, and instead the audit report is merely evidence that plaintiff justifiably relied on Mr. Brown's earlier oral representations in January 2017. We disagree with plaintiff's contention, which is contradicted by his own verified complaint.

"[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).) *Park* explained: "A claim arises from protected activity when that activity underlies or forms the basis for the claim. [Citations.] Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citations.] . . . [T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability." (*Id.* at pp. 1062–1063.)

Here, the audit report in the 10-K filing clearly "forms the basis for" plaintiff's fraudulent inducement claims and " 'gives rise to [Mr. Brown's] asserted liability.' " (*Park, supra,* 2 Cal.5th at pp. 1062, 1063.) Plaintiff said so himself in his verified complaint. For example, the complaint alleges plaintiff was induced to hold

14

his Banc securities "because of representations by Defendant Brown including his personal sign off as lead audit partner on the Banc's 2016 fiscal year financial audit on March 1, 2017." And, "[t]he March 1, 2017 Form 10K attaching the financial statements with Defendant Brown's knowingly false audit report was signed, *inter alia,* by Defendants Boyle, Turner, Sznewajs, Benett, Karish, Schnel and Lashley. These defendants knew that the statements in the Form 10K and attached audit report were false and misleading."

We see no basis to conclude the "knowingly false audit report" did not give rise to Mr. Turner's asserted liability, or that it "merely provides evidence that supports Plaintiff['s] fraud-based claims," particularly since plaintiff expressly alleged he was induced to hold his securities because of representations in the audit report.

### b.      Probability of prevailing

Plaintiff presented no evidence on the merits of his claim, simply arguing the audit report was only evidence and not the misrepresentation on which he relied—the contention we have just rejected. Plaintiff offers no other evidence to establish the elements of fraudulent inducement or negligent misrepresentation, and accordingly has not shown a probability of prevailing on the claims that Mr. Brown's audit report sign-off induced him to hold his securities. The trial court correctly struck those allegations.

**[Begin nonpublished portion]**

### 2.      Mr. Turner's Anti-SLAPP Motion

Plaintiff alleged six causes of action against Mr. Turner: the inducement claims, the reputational harm claims, and the UCL claims. We discuss the allegations, the evidence, and our

15

conclusions separately for the inducement claims, and then turn to the other claims.

### a.    The inducement claims:  the facts

Plaintiff alleged Mr. Turner made significant misrepresentations on which plaintiff reasonably relied to hold, rather than sell his stock.  These misrepresentations were made in six investor presentations, in an earnings call, and in a 10-Q quarterly report of financial performance filed with the SEC.

The misrepresentations related to Banc's financial projections, including optimistic earnings per share guidance asserting Banc "would make $2.00 per share and achieve very attractive financial returns across multiple metrics."  Plaintiff's complaint cites and attaches Banc's Form 8-K's filed with the SEC, which attach the investor presentation materials containing the earnings per share guidance.[2]

Mr. Turner's alleged misrepresentations "also related to Banc's 'significantly enhanced corporate governance,' and other similar statements related to Banc's internal controls."

Earnings per share missed the January 30, 2017 guidance by over 60 percent.

Mr. Turner's anti-SLAPP motion contended the inducement causes of action arose from protected activity—from statements in SEC filings, investor presentations, and press releases about Banc's internal controls and efforts to improve corporate governance—all of which were statements made to the public

---

[2]     "The SEC requires disclosure of specified material changes and other events 'that the registrant deems of importance to security holders' whenever they occur via a Form 8-K."  (*Hawran, supra,* 209 Cal.App.4th at p. 263, fn. 2.)

16

about an issue of public interest under section 425.16, subdivision (e)(4).  Plaintiff could not establish a probability of prevailing, Mr. Turner argued, because they could not establish they relied on Mr. Turner's statements when deciding to hold their securities, or that he made statements with the intent to induce plaintiff's reliance.[3]

In response to Mr. Turner's motion and to the other anti-SLAPP motions, plaintiff submitted an 80-page declaration, along with several other declarations.  (The other declarations relate to plaintiff's reputational harm and UCL claims, discussed *post*.) Mr. Turner filed 140 objections, many of which were sustained.

The trial court found all of plaintiff's allegations against Mr. Turner arose from protected activity under subdivision (e)(4). The court stated the allegations that Mr. Turner participated in a May 3, 2017 earnings call, and approved and signed a 10-Q filed by Banc on May 10, 2017, misrepresenting Banc's financial position including inflated earning guidance, were public statements relating to Banc's financial position "with a likelihood to impact individual investors as well as 'market sectors or the markets as a whole,' " citing *Fontani, supra,* 129 Cal.App.4th at page 733. Plaintiff could not prevail on these claims, the court said, because the allegations related to forward-looking predictions that were nonactionable opinions, and there was no competent evidence the representations were false when made.

**b.    The inducement claims:  the law**

Section 425.16, subdivision (e)(4) protects any conduct in furtherance of the exercise of free speech or petition rights "in

---

[3]    Mr. Turner also contended the negligent misrepresentation claim was barred by the statute of limitations.

connection with a public issue or an issue of public interest" (*ibid*.), and is referred to as "the catchall provision" (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 140 (*FilmOn*)). *FilmOn—a* case we discuss in more detail *post* in connection with plaintiff's other claims—tells us the catchall provision "demands 'some degree of closeness' between the challenged statements and the asserted public interest" (*id.* at p. 150), and that we consider the context, "including audience, speaker, and purpose" (*id.* at p. 152).

The fraudulent inducement claims concern Mr. Turner's statements about Banc's financial projections—statements made in earnings calls, and in reports to the SEC containing inflated earnings projections. We agree with the trial court's assessment that these were public statements relating to Banc's financial position, and were likely to impact individual investors and market sectors or the markets as a whole.

"[C]onduct capable of affecting a significant portion of the investing public can meet the test" under the catchall provision. (*Fontani, supra,* 129 Cal.App.4th at p. 732.) "[A] publicly traded company with many thousands of investors is of public interest because its successes or failures will affect not only individual investors, but in the case of large companies, potentially market sectors or the markets as a whole." (*Global Telemedia Int'l, Inc. v. Doe 1* (C.D.Cal. 2001) 132 F.Supp.2d 1261, 1265.) The financial projections of a large, publicly traded company like Banc are of great interest to a significant community of investors.

When we consider the context of Mr. Turner's statements on the earnings call and earnings guidance in the 10-Q report— "including audience, speaker, and purpose" (*FilmOn, supra,* 7 Cal.5th at p. 152)—we find the statements had a high " 'degree of closeness' " (*id.* at p. 150) to the public interest in the well-being (or

18

not) of a publicly traded company with many investors. Those statements were thus made "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)[4]

We also agree with the trial court that plaintiff failed to make a prima facie showing he would prevail on his inducement claims against Mr. Turner. As the court observed, statements or predictions about future events (the anticipated $2 per share earnings guidance for 2017) are deemed nonactionable opinions, and there was no admissible evidence that the representations in investor presentations and earnings calls were false when made.

Plaintiff cites federal district court cases stating that forward-looking statements accompanied by cautionary language are not immunized under federal securities laws where "plaintiffs have alleged facts suggesting that defendants had actual knowledge of the falsity of their statements." (E.g., *In re PMI Group, Inc.* (N.D.Cal. Nov. 2, 2009, No. C 08-1405) 2009 U.S.Dist.Lexis 101582, at p. *11.) These cases do not help plaintiff, who presented no admissible evidence suggesting that

---

[4] Our decision on this point makes it unnecessary to address Mr. Turner's contention that his alleged statements giving rise to both the inducement and reputational harm claims were also protected as communications made in connection with the then-ongoing securities fraud class action litigation and the SEC investigation, under section 425.16, subdivision (e)(2). In that connection, we also deny plaintiff's request for judicial notice of the complaint filed in *DeFrees v. Kirkland* (C.D.Cal. Aug. 23, 2012, Nos. CV 11-4272, CV 11-4574) 2012 U.S.Dist.Lexis 195922), which pertains only to Mr. Turner's contention about protected activity under subdivision (e)(2).

19

defendants knew the earnings guidance or statements in the earnings call were false when made.

Plaintiff says we may infer knowledge of falsity of Mr. Turner's financial projections from other evidence, but that evidence has no bearing on the earnings guidance at the time it was issued.[5] Then he cites paragraphs 147 and 148 of his own declaration, but this gets him nowhere either.

In paragraph 147, plaintiff quotes the complaint's allegation that Mr. Turner knew the earnings guidance was false because he stated to others in February 2017 "that earnings per share were coming in well below guidance and Banc was seeking to manipulate earnings to obscure that fact from the market and from [plaintiff]." The trial court sustained Mr. Turner's objection to that paragraph of plaintiff's declaration.

The next paragraph (¶ 148) stated that "Turner made these statements to colleagues and Banc employees, including Jeff Seabold, the then-Vice chairman at Banc, on or about February 2017." The court overruled Mr. Turner's objection to paragraph 148.

Plaintiff contends that Mr. Turner's statements to Seabold (the content of which is not in evidence due to the sustained objection) and Seabold's statements to plaintiff (presumably to the same effect, although plaintiff does not specifically say so) "are not

---

[5] Plaintiff says we can infer Mr. Turner knew the earnings guidance was false from (1) later conversations with defendant Boyle after the earnings results did not come to pass, to the effect they would blame plaintiff; (2) Mr. Turner's attempt to pump up earnings by liquidating capital assets; (3) Mr. Turner's participation in the cancellation of bonuses; and (4) Mr. Turner's "attempts to intimidate and silence any potential whistleblowers."

hearsay, as Turner is a party . . . and both Turner and Seabold were employees of Banc, which is also a party . . . , and thus, their statements are either admissions or admissions on behalf of Banc."

We think not.  Plaintiff does not explain or offer authority for the proposition, in effect, that any alleged statement by a party is an admission, no matter how many levels of hearsay are involved.  "Multiple hearsay may not be admitted unless there is an exception for each level."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)  Here, plaintiff says that Seabold (who is not a party) said that Turner said Banc was seeking to manipulate earnings.  That is at least double hearsay.  Nor does plaintiff offer any authority to support the assertion that Seabold's hearsay statement was an "admission[] on behalf of Banc."  Plaintiff does not even trouble to refer to the Evidence Code at all.

In short, plaintiff presented no admissible evidence Mr. Turner knew or should have known the earnings guidance was false when made, and so has not made a prima facie case supporting his fraudulent and negligent inducement claims.

c.     **The reputational harm and UCL claims:  the facts**

In his claims for blacklisting, tortious interference with prospective economic advantage, violation of the UCL and conspiracy to violate the UCL, plaintiff alleged that Mr. Turner made certain statements that caused plaintiff reputational harm and interfered with his business relationships after he left Banc.

Plaintiff alleged (and produced declarations in response to Mr. Turner's motion) that Mr. Turner and others "discussed how they were going to make sure that [plaintiff] was 'crushed.' " A declaration from Martice Mills further stated that Mr. Turner and others discussed "that they had to convince investors that

21

Banc's poor performance during the first quarter was really [plaintiff's] fault and so they were going to do whatever it took to make sure [plaintiff] was blamed for everything negative at Banc. They also stated that they knew that what they were doing would cause his future ventures to 'fail' and that it was important that his new businesses failed and he didn't land at a new bank quickly or the suggestion that he was to blame would not be as plausible." Mr. Mills described other conversations among Banc employees where Mr. Turner said that plaintiff "did improper and illegal things while CEO of Banc"; and that he (Turner) "could handle KPMG and Chris Brown and that everything was going to just be blamed on [plaintiff]."

A declaration from Paul Simmons, chief credit officer of Banc at the time, stated he attended an investor conference in March 2017. He was standing with Mr. Turner and defendant Boyle, when "[n]umerous analysts and investors approached us to find out what really happened with [plaintiff's] departure. Turner and Boyle told the analysts and investors that [plaintiff] was unethical, that he had broken securities laws and bank regulations, that he had engaged in self-dealing, that Banc was hard pressed to recover from the damage that he had done to Banc." Two other former Banc employees, Heather Endresen and Gary S. Dunn, also declared Mr. Turner said that plaintiff had done bad and unethical things while he was at Banc.

Plaintiff identified several entities with whom he had economic relationships, and asserts he "lost those relationships and benefits as a result of Turner's interference." The Mills and Simmons declarations stated that J.P. Morgan Chase, Silvergate, Texas Capital Bank and Wells Fargo "declined to do business with," or in one case delayed investments in, two of plaintiff's

businesses. (Plaintiff does not specify any communications by Mr. Turner with those entities.)

Similarly, plaintiff's complaint alleged that Banc defendants engaged in unfair competition against plaintiff by pressuring third parties not to do business with him, and by making false and defamatory statements that plaintiff had engaged in unlawful behavior. The complaint alleged plaintiff and defendants are competitors, and defendants' attacks on plaintiff's "reputation, relationships, financial strength, and ability to fairly compete with Banc" were made "in order to keep [plaintiff] from competing with the Defendants in the banking business and within private equity and financial services." This resulted in plaintiff's inability to pursue suitable replacement employment or other profitable partnerships with banks and other financial services organizations.

Mr. Turner contended these claims, too, were statements made to the public about an issue of public interest. Plaintiff could not establish a probability of prevailing, Mr. Turner argued, because the statute of limitations barred the blacklisting and interference claims. And, plaintiff could not show Mr. Turner made any of the alleged statements to a prospective employer or third party with whom plaintiff had an existing economic relationship.

The trial court found plaintiff's allegations against Mr. Turner arose from conduct protected by the catchall provision as statements or conduct "in connection with a public issue or an issue of public interest" under subdivision (e)(4). The allegations "that Mr. Turner signed off on publicly filed documents with statements regarding [plaintiff's] departure from Banc" were protected; the "high-profile nature of [plaintiff's] departure from

23

Banc and the reasons for his departure, could have impacted individual investors and the markets, and was of concern to a substantial number of people." And the statements made in private communications related to plaintiff's departure from Banc were protected because they concerned a public issue; citing the *FilmOn* case, the court said "[t]he statements as alleged may contribute to the public conversation despite . . . being made to individuals in some circumstances, rather than larger groups."

The court found plaintiff failed to establish a probability of prevailing on the reputational harm claims, both of which were barred by the statute of limitations (one year for the blacklisting claim and two years for the interference claim). (Mr. Turner's latest statement occurred in May 2017, and the complaint was filed in October 2019.) The court observed that plaintiff "[has] not refuted this contention," and further stated plaintiff produced no admissible evidence Mr. Turner made any statements concerning plaintiff "in 2017–2019."

The court reached a different conclusion on plaintiff's UCL claims, finding plaintiff had presented evidence "adequate to show 'minimal merit' " to those claims. The court cited the Mills, Dunn, Endresen, and Simmons declarations described above, and concluded that evidence was sufficient to establish plaintiff's unfair competition claims had minimal merit "as unfair business practices."

### d. The reputational harm and UCL claims: the law

Plaintiff contends the trial court erred when it concluded Mr. Turner's communications about plaintiff's conduct at and departure from Banc were protected under the catchall provision. We disagree.

24

### i. Protected activity
### under the catchall provision

Our analysis is informed by *FilmOn,* which provides direction on how a court should analyze whether communications qualify for anti-SLAPP protection under the catchall provision. (*FilmOn, supra,* 7 Cal.5th at pp. 142–143.)  The court first concluded that we "must consider the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest." (*Id.* at p. 149.)  The court then explained:

"The inquiry under the catchall provision . . . calls for a two-part analysis rooted in the statute's purpose and internal logic. First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech.  (§ 425.16, subd. (e)(4).)  Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.  It is at the latter stage that context proves useful." (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.)

"In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898[]); and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*FilmOn, supra,* 7 Cal.5th at pp. 145–146.)

25

"We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant— through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 151.) "[A] statement is made 'in connection with' a public issue when it contributes to— that is, 'participat[es]' in or furthers—some public conversation on the issue. [Citation.] But the inquiry of whether a statement contributes to the public debate is one a court can hardly undertake without incorporating considerations of context—including audience, speaker, and purpose." (*Id.* at pp. 151–152.)

In *FilmOn,* the defendant provided confidential reports to its clients that labeled websites as containing "adult content" or "copyright infringement" material, and one of the websites sued the defendant, alleging disparagement of its digital distribution network. (*FilmOn, supra,* 7 Cal.5th at p. 140.) The reports were issued privately, "to a coterie of paying clients," who use the information "for their business purposes alone. The information never entered the public sphere, and the parties never intended it to." (*Id.* at p. 153.) The court found the defendant's reports "— generated for profit, exchanged confidentially, without being part of any attempt to participate in a larger public discussion—do not qualify for anti-SLAPP protection under the catchall provision, even where the topic discussed is, broadly speaking, one of public interest. This is not because confidential statements made to serve business interests are categorically excluded from anti-SLAPP protection. It is instead because [the defendant's] reports are too tenuously tethered to the issues of public interest they implicate,

26

and too remotely connected to the public conversation about those issues, to merit protection under the catchall provision." (*Id.* at p. 140.)

### ii. This case

As *FilmOn* directs, we first "identify[] the relevant matters of public interest" and then move "to addressing the specific nature of defendant's speech and its relationship to the matters of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 152.)

In contrast to the reports involved in *FilmOn*, here, the circumstances of plaintiff's departure from Banc were a topic of considerable public discussion at the time. Beginning on October 18, 2016, when the blog post first publicized the allegations against Banc and plaintiff, the record is replete with public discussion of Banc, plaintiff's conduct at Banc and his departure on January 23, 2017. There were press releases from Banc, securities fraud lawsuits, an SEC investigation, and articles on websites and in the Los Angeles Times and other publications. By way of example of the last category, a Bloomberg Law news story on March 2, 2017, about Banc's 10-Q and 10-K filings states "[a]dverse opinion on internal controls due to 'inadequate tone at the top' isn't surprising given former CEO Steven Sugarman's quick exit, inaccurate press release in Oct., historically-weak corporate governance, excessive related-party transactions" and that "Banc disclosed other related-party transactions from Sugarman era that it's taken steps to curtail." (Maranz, *Banc of California's 'Clean' Filings Remove Overhang: FBR,* Bloomberg Law (Mar. 2, 2017).)

In short, as the trial court aptly put it, "[r]eview of the complaint and filings in this motion disclose the high-profile nature of [plaintiff's] departure from Banc and the reasons for his

departure." Plaintiff " 'was a person . . . in the public eye' " and the speech occurred " 'in the context of an ongoing controversy, dispute or discussion' " (*FilmOn, supra,* 7 Cal.5th at p. 145), so we have no doubt the reason for plaintiff's departure was a matter of public interest.

That brings us to "addressing the specific nature of defendant's speech and its relationship to the matters of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 152.) Here, the requisite connection between the challenged statements and the issue of public interest is direct, not tenuous or remote.

As we have described, the evidence of Mr. Turner's statements consists of the Mills, Simmons, Endresen and Dunn declarations. These were to the effect that Mr. Turner discussed with Mr. Mills and others how they were going to "crush" plaintiff and make sure he was blamed for everything negative; told Ms. Endresen plaintiff "had done some very bad things" while he was at Banc, and made similar statements to Mr. Dunn; and made statements to numerous analysts and investors at a conference that plaintiff was unethical, had broken securities laws and engaged in self-dealing.

This is not a case, as in *FilmOn*, where the defendant's statements were "too tenuously tethered to the issues of public interest they implicate[d]," and "too remotely connected to the public conversation about those issues, to merit protection under the catchall provision." (*FilmOn, supra,* 7 Cal.5th at p. 140.) On the contrary, Mr. Turner's statements were about the specific issues being publicly discussed in the press and in lawsuits. In *FilmOn,* the information in the defendant's confidential reports to its clients "never entered the public sphere, and the parties never intended it to." (*Id.* at p. 153.) The opposite is true here.

28

Mr. Turner was Banc's interim president and CFO after plaintiff resigned and his statements reflected Banc's position in the ongoing, very public controversy about Banc's and plaintiff's conduct. Mr. Turner made those statements to an audience of other bank employees and investors and analysts, all of whom were likewise interested in the circumstances surrounding plaintiff's departure. The context—audience, speaker and purpose—demonstrates Mr. Turner's speech was "in connection with" an issue of public interest, as required by *FilmOn*.

Plaintiff insists that Mr. Turner's statements were "private conversations meant to be kept private" and did not "contribute to public conversation." Plaintiff's claim Mr. Turner's statements were "meant to be kept private" is contradicted by plaintiff's own evidence the statements were made in response to "[n]umerous" analysts and investors who were inquiring about the circumstances of plaintiff's departure, and by his own allegations that Mr. Turner's statements were made in order to harm plaintiff's reputation in the banking industry.

Much of plaintiff's brief is spent discussing *Murray v. Tran* (2020) 55 Cal.App.5th 10. In *Murray,* unlike here, there was no ongoing public conversation about the issue of public interest— which was the plaintiff's competence as a dentist. (*Id.* at p. 30.) The court found, for example, that certain of the challenged statements were not made to patients or anyone outside the parties' dental practice, and were made solely for private purposes, such as to enhance the quality of dental care at the practice. (*Id.* at p. 36.) Here, by contrast, there clearly was an existing public discussion about the circumstances surrounding plaintiff's departure from Banc.

As *FilmOn* tells us, "[w]e are not concerned with the social utility of the speech at issue," but rather with whether a defendant "participated in, or furthered, the discourse that makes an issue one of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 151.) That standard is met here.

### iii. The probability of prevailing on the reputational harm causes of action

Plaintiff did not satisfy his burden of showing a probability of prevailing on his claim against Mr. Turner of intentional interference with prospective economic advantage.[6] The elements of the tort are " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 (*Korea Supply*).) "[T]he third element also requires a plaintiff to plead intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship." (*Id.* at p. 1154.)

Plaintiff contends his claim is not barred by the statute of limitations (two years), even though Mr. Turner's last statement was made in May 2017, and the complaint was filed in October 2019. Plaintiff says the statute of limitations accrued when his economic relationships were disrupted, not when Mr. Turner made his statements. Plaintiff asserts his "relationships were disrupted

---

**6** Plaintiff makes no argument in his opening brief challenging the court's ruling on his blacklisting claim.

as late as 2020 . . . ," and he "submitted evidence that his economic relationship with Broadway Federal was disrupted as a result of Turner's defamatory statements in 2020."

Plaintiff's assertion has at least one fatal flaw. All the evidence he cites in his brief to support it is evidence to which Mr. Turner's objections were sustained.[7] Plaintiff says this evidence "is admissible," making a two sentence argument: "The statements of Turner are admissions. The other statements by [third parties] are offered to show their respective states of mind." That is not a reasoned argument, and no legal authority is offered to support it. Consequently, plaintiff has demonstrated no abuse of discretion in the trial court's evidentiary rulings, and there is no admissible evidence showing Mr. Turner's alleged interference occurred within the statute of limitations.

Even without the bar of the statute of limitations, plaintiff has not presented admissible evidence to satisfy the elements of a claim of tortious interference with prospective economic advantage against Mr. Turner. Plaintiff says he presented evidence "that Turner reached out to specific entities with which Sugarman had an economic relationship with the probability of future economic benefit." The trial court sustained objections to the pertinent parts of all the evidence he cites.

In his reply brief, plaintiff argues at some length that the trial court abused its discretion and "many of the statements are admissible" as prior inconsistent statements, party admissions, or

---

[7] We also harbor considerable doubt that a defendant's statements in 2017 could be "designed to disrupt" and actually disrupt (*Korea Supply, supra,* 29 Cal.4th at p. 1153) a deal that "died as of April 2020."

31

to prove state of mind.  We do not consider arguments made for the first time in the reply brief.

e.    **Mr. Turner's appeal:  the merits of the UCL claims**

We agree with Mr. Turner that the trial court erred as a matter of law in finding plaintiff's UCL claims had minimal merit.[8]

On his UCL claims, plaintiff's complaint requested "that Mr. Sugarman be awarded restitutionary damages in an amount to be determined at trial, plus an award of reasonable legal fees and expenses, and that the Court enter an order enjoining the Banc Defendants from continuing to take actions to disrupt Mr. Sugarman's ability to compete in the financial and banking markets."

The only remedies available under the UCL are restitution and injunctive relief.  Restitution is the only monetary remedy available.  The principles are explained in *Korea Supply, supra,* 29 Cal.4th at page 1149.

"[A]n order for restitution is one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was

---

[8]    In his respondent's brief on Mr. Turner's appeal, plaintiff contends Mr. Turner did not establish "that the Warrant Share Claims arise from protected activity."  This refers to plaintiff's "UCL claims to the extent they are based on Banc Defendants' breaches of or interference with certain agreements to which Plaintiffs and Banc were parties and Banc's failure to convert certain Warrant Shares under those agreements."  This is another baseless contention; none of the causes of action relating to breach of these agreements was alleged against Mr. Turner.

32

taken, that is, to persons who had an ownership interest in the property or those claiming through that person.' [Citation.] The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (*Korea Supply, supra,* 29 Cal.4th at p. 1149.)

*Korea Supply* held "[t]he remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants." (*Korea Supply, supra,* 29 Cal.4th at p. 1149.) "Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff." (*Ibid.*) "Further, the relief sought by plaintiff is not restitutionary under an alternative theory because plaintiff has no vested interest in the money it seeks to recover." (*Ibid.*)

The same is true here. (See *Korea Supply, supra,* 29 Cal.4th at pp. 1150–1151 ["The nonrestitutionary disgorgement remedy sought by plaintiff closely resembles a claim for damages, something that is not permitted under the UCL. As one court has noted: 'Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims.' "].)

Nor can plaintiff obtain injunctive relief against Mr. Turner. The UCL "has not altered the nature of injunctive relief, which requires a threat that the misconduct to be enjoined is likely to be repeated in the future." (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 465; *id.* at p. 463 ["Injunctive relief is appropriate only when there is a threat of continuing misconduct."].) The evidence that Mr. Turner has not worked at Banc or in the banking industry since June 2017 is unrefuted. Plaintiff has offered no evidence that Mr. Turner has said anything

to anyone to disparage plaintiff, or has done anything to "disrupt [plaintiff's] ability to compete," after he (Mr. Turner) left Banc in June 2017. "[I]n the absence of a threat that an unlawful act will occur in the future" (*id.* at p. 464), injunctive relief is not authorized under the UCL.

Accordingly, plaintiff has not established a probability of prevailing on his UCL claims against Mr. Turner.

**[End nonpublished portion]**

**DISPOSITION**

The order granting defendant Brown's anti-SLAPP motion to strike allegations of fraudulent and negligent inducement to hold securities, to the extent the allegations refer to defendant's sign-off on Banc's 2016 fiscal year financial audit, is affirmed. The order granting defendant Turner's anti-SLAPP motion to strike plaintiff's second, third, seventh and eighth causes of action is affirmed. The order denying defendant Turner's anti-SLAPP motion to strike plaintiff's fifth and sixth causes of action is reversed and the trial court is directed to grant the motion. Both defendants shall recover costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.     HARUTUNIAN, J.†

---

†      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34